**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

THE DISTRICT OF COLUMBIA            :
                                    :
                                    :
                                    :        Civil Action No. 05-1309
            Plaintiff,              :        (RJL)
                                    :
v.                                  :
                                    :
JEPPSEN                             :
                                    :
            Defendant               :
_____:

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Comes now plaintiff, by and through counsel, pursuant to FRCP 56, and moves this honorable Court to grant plaintiff summary judgment in its favor. As grounds for this motion, and as more fully discussed in the accompanying Memorandum, plaintiff submits that the Hearing Officer erred when he found that the District of Columbia Public Schools ("DCPS") failed to meet its burden of proof, that Key Elementary school was an appropriate placement for the student.

Respectfully submitted,

ROBERT J. SPAGNOLETTI
Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General for the District of Columbia

/s/ Edward P. Taptich
EDWARD P. TAPTICH [012914]
Chief, Equity, Section 2

/s/ Maria L. Merkowitz
MARIA L. MERKOWITZ [312967]
Senior Litigation Counsel
441 4th Street, N.W.
Sixth Floor South
Washington, DC 20001
(202) 442-9842
FAX  -  (202) 727-3625

November 14, 2005

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**


| | | |
|---|---|---|
| THE DISTRICT OF COLUMBIA | : | |
| | : | |
| | : | |
| | : | Civil Action No. 05-1309 |
| Plaintiff, | : | (RJL) |
| | : | |
| v. | : | |
| | : | |
| JEPPSEN | : | |
| | : | |
| Defendant | : | |
| _____ | : | |


**MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT**


Preliminary Statement

On March 28, 2005, a Hearing Officer ("HO") issued a Determination pursuant to the Individuals with Disabilities Education Act, 20 U.S.C. 1400 *et. seq*., in which he ordered the District of Columbia Public Schools ("DCPS"), *inter alia,* to continue to place and fund the student at the River School ("River")for the school year 2004-2005. (R at 14)  The HO based his decision on a finding that DCPS had not sustained its burden of proof in demonstrating that its proposed placement at Key Elementary school ("Key") was appropriate.  (R at 2)

The student is a seven year old child who has been determined to be a child with a disability with a profound hearing loss.  The student wore hearing aides until 2001 when she received a cochlear implant. (R at 41) (Tr. at 71-72)  With the implant the student can

hear a broad range of sounds but does not necessarily understand language and what is being said.

The student was enrolled in the River School program in September 2000, and was in attendance at that school at the time of the hearing.  (R at 2)  At the time the student began her enrollment at River, DCPS did not have a public program for the hearing impaired. By September 2004, DCPS had such a program in place housed at Key. (Tr. at 49)  In September 2004, DCPS initiated a change of placement for the student to Key, but the parents rejected the placement and filed a due process hearing request.  In a settlement agreement dated November 9, 2004, DCPS agreed to continue funding the student's placement at River until it conducted a multi-disciplinary team/individualized educational program ("MDT/IEP") meeting to review and revise the student's IEP and discuss and determine placement.  (R at 2)

DCPS convened the MDT/IEP meeting on November 17, 2004.  (R. at 24) Members, who included the parent, her counsel, River staff, and DCPS personnel, including staff members of Key, reviewed, *inter alia,* the student's most recent speech language evaluation. (R. at 37) All the MDT members agreed that the student had multiple disabilities including other health impairment ("OHI"), hearing impairment ("HI"), and speech/language impairment ("SLI"). (R. at 38)   However there was disagreement between the DCPS team members and the River staff as to whether the student's primary disability classification was HI or SLI.  (R. at 38) (Tr. at 51-53) The student's primary disability in her previous IEP was HI.  (Tr. at 52) (R. at 71)

There was also disagreement whether the student's specialized instruction should be delivered in a general education inclusion setting as done at River or whether the

services should be delivered in a full time special education setting designed to prepare the student for mainstreaming as at Key. (Tr. at 53)  DCPS drafted an IEP that included the following weekly services: 1 hour of speech/language ("S/L") therapy, 25.5 hours of specialized instruction and 1 hour of audiology. (R. at 24) The IEP indicated that the student disability classification was multiply disabled ("MD") and listed each of the disabilities. (R. at 24) The IEP indicated that the amount of time the student was to be out of the regular setting was 98% of the time. (R. at 24) The DCPS MDT team members considered whether a general education placement would be appropriate but rejected it because "[The student] is not working on grade level and needs [specialized instruction] resource." (R. at 35)

As a result of the disagreement the parent indicated on the IEP that she did not agree with its contents. (R. at 24) At the conclusion of the meeting[1] the parent and the members of River stated that they would draft an alternative IEP document. However, River did so without the participation of DCPS or of Pamela Owens, the local educational agency representative ("LEA"), a necessary party to the creation of an IEP. (Tr. at 55, 70)

The River document indicated an MD classification for the student, as had DCPS's IEP, but it listed LSI as the first of the student's three disabilities.  The alternative IEP also prescribed that the student's specialized instruction and group speech/language therapy be delivered by a special education teacher and a speech language pathologist ("SLP") in a general education setting.    The IEP document also indicated that 1 hour of individualized S/L therapy and 1 hour of audiology would be delivered in a special education setting.  The percent of time the document proposed the student be out of a regular education setting was 6%.  The goals and objectives were the

---

[1] At or about 5:00 p.m. (Tr. at 70)

same in the two IEPs.  (Tr. at 39)  In fact it was the personnel from River who presented

the goals and objectives which were written into DCPS' IEP.  (Tr. at 50-51)

　　　　Following review of the student's evaluation, the disability classification and the

IEP goals and objectives, the MDT members discussed the benefits of the student staying

at River or being moved to Key.  The parent and the River staff asserted that the student's

placement should remain River.  DCPS considered the provision of 25.5 hours of

specialized instruction to require a special education setting and asserted that Key was the

appropriate placement.  At the conclusion of the meeting DCPS issued a Prior Notice of

Placement for the student to be outside the general education setting and for her

placement location to be changed from River to Key.

　　　　As a result of the change in placement the parents filed a Request for Due Process

Hearing on November 23, 2004.  (R. at 130)  In their request the parents alleged that

DCPS had denied the student a  free appropriate public education ("FAPE") because they

"fail[ed] to develop an IEP that meets the unique and individual needs of [the student]…;

they pre-determin[ed] [the student's] placement prior to developing her IEP…; and

issu[ed] a Notice of Placement to a program that is more restrictive that (sic) [the

student's] current educational placement…."  (R. at 132)

　　　　In his decision, dated March 28, 2005, the HO concluded that "DCPS sustained its

burden of proof that the IEP was developed to meet the unique needs of the student."  (R.

at 10) The HO further concluded that "DCPS presented sufficient evidence that the

placement decision was made with full participation of the parent despite the

disagreement that resulted regarding the placement at the end of the discussion."  (R. at

10)   Lastly, the HO concluded that "DCPS did not sustain its burden of proof in

demonstrating that the proposed change of placement was appropriate." (R. at 12)  The HO found that DCPS' proposed placement of Key Elementary school was not the least restrictive  environment ("LRE") in which to educate the student, in violation of 34 CFR 300.550.  DCPS appeals this last finding.

## ARGUMENT

### I.    The Standards of Review Applicable in This Case

#### A.  The requirements for summary judgment

Under Rule 56 of the Federal Rules of Civil Procedure, a party is entitled to summary judgment if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  Material facts are those "that might affect the outcome of the suit under the governing law." _Farmland Industries, Inc. v. Grain Board of Iraq_, 248 U.S. App. D.C.  276, 904 F. 2d 732, 735 (1990) (citing _Anderson v. Liberty Lobby, Inc._, 477 U.S. 242, 248 (1986)).[2]

To meet the initial burden of showing "the absence of a genuine issue of material fact" on an essential element of the non-movant's case, the movant may demonstrate that the respondent has no evidence to support an essential element of his or her case.  _Street v. J.C. Bradford & Co._, 886 F.2d 1472, 1479 (6th Cir. 1989).  In answer, the respondent must "present affirmative evidence" in order to defeat the motion, and "[w]here the

---

[2] Anderson v. Liberty Lobby, Inc, supra, 477 U.S. at 248, similarly describes the rule for determining materiality:

> As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted. . . Any proof or evidentiary requirements imposed by the substantive law are not germane to this inquiry, since materiality is only a criterion for categorizing factual disputes in their relation to the legal elements of the claim and not a criterion for evaluating the evidentiary underpinning of those disputes.

record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion for summary judgment should be granted.  Id.

###   II.    The criteria for review of administrative decisions under IDEA

IDEA provides for judicial review in state or federal court to "[a]ny party aggrieved by the findings and decision" rendered in a due process hearing.  20 U.S.C. §1415(c).  In conducting such review, the reviewing court "shall receive the records of the administrative proceeding, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. §1415(e).

###   III.    The Hearing Officer erred when he concluded that DCPS had not sustained its burden of proof that Key Elementary school was an appropriate placement for the student.

Pursuant to 5 DCMR 3022.16 DCPS bears the burden of proof to establish that a proposed placement is adequate to meet the educational needs of the student.  Here, the HO concluded that DCPS had not sustained its burden to establish that  Key was an appropriate placement for the student because "[t]he parent's counsel presented more experts to support a finding that the student's current placement and the methodology used is the most appropriate for the student's needs."  (R. at 13)

Plaintiff contends that the burden of proof is not necessarily met by the number of witnesses one side presents but rather whether the evidence, taken as a whole, supports the proponent's position.  Here, despite the fact that the defendants presented more witnesses at the hearing, DCPS did indeed meet its burden of demonstrating that its proposed placement for the student could meet the unique needs of the student.

To meet the requirements of the IDEA, a school district must provide each

disabled student with a free appropriate public education ("FAPE") tailored to his or her individual needs. *U.S.C. Sec.* 1400(d)(1)(A). A free appropriate public education is one "specifically designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child to benefit from the instruction." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley,* 458 U.S. 176, 188-89 (1982). The school district, however, is not required to provide the best possible education. *See Heather S. v. Wisconsin,* 125 F.3d 1045, 1057 (7th Cir. 1997).

In analyzing the first factor of whether the public placement violates IDEA, the court undertakes a two-step sub-inquiry, asking (a) whether the school officials complied with the procedures set forth in IDEA, and (b) whether the IEP developed through IDEA procedures was reasonably calculated to enable the child to receive educational benefits. *Bd. Of Educ. V. Rowley,* 458 U.S. 176, 206-07 (1982); *Knabley v. Bexley City Sch. Dist.,* 238 F.3d, 755, 763 (6th Cir. 2001). If these requirements are met, the State has complied with the obligations imposed by Congress.

In the instant case, there has been no finding that DCPS failed to comply with the procedures set forth in the Act. Thus there is no need to address the first part of the *Rowley* test. Accordingly, the only issue to be determined is whether the IEP and placement proposed by DCPS secure the student the right to a free appropriate free public education guaranteed her by Sec. 612(1) of the Act.

Here, the hearing officer apparently concluded that the challenged IEP and placement failed to satisfy section 612(5) of the Act which requires that "to the maximum extent appropriate" the student "be educated with children who are not handicapped," and that a child be removed from the regular classroom environment and placed in a special class

only to the extent that "the nature or severity of [the student's] handicap is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 20 U.S.C. Sec. 1412 (5) (B). n5

However, while the IDEA requires that in providing special education, children with disabilities be educated in the least restrictive environment ("LRE") and, to the extent appropriate, with children who are non-disabled, meeting the LRE requirement does not require that a disabled child be educated in the same classroom with non-disabled children in all circumstances.  The placement must be appropriate.

It is clear that the courts have determined that the Act's mainstreaming preference is to be given effect only when it is clear that the education of the particular handicapped child can be achieved satisfactorily in the type of mainstream environment sought by the challengers to the IEP proposed for that child.  See A.W. v. Northwest R-1 School District, 813 F.2d 158, 163 (8th Cir. 1986) cert. denied, 484 U.S. 847 (1987) (holding that Sec. 1412(5) "significantly qualifies the mainstreaming requirement by stating that it should be implemented 'to the maximum extent appropriate,' and that it is inapplicable where education in a mainstream environment 'cannot be achieved satisfactorily.'")  See also Mark v. Grant Wood Area Education Agency, 795 F.2d 52, 54 (8th Cir. 1986), cert. denied, 480 U.S. 936 (1987). (rejecting "the view that the mainstreaming provisions of the Act are satisfied only if a handicapped child is educated in the same classroom with non-handicapped children"); Maher, 793 F.2d at 1483  ("the EAHCA does not compel localities to place handicapped students in regular education classes, but only in the least restrictive setting consistent with their needs and those of other students."); Johnston by Johnston v. Ann Arbor Public Schools, 569 F. Supp. 1502, 1508-09 (E.D. Mich. 1983)

(finding no violation of the Act's mainstreaming goal where the transfer of a handicapped child from a regular classroom to a special education classroom was necessary and appropriate); _Taylor v. Board of Education of Copake-Taconic Hills Central School District,_ 649 F. Supp. 1253, 1258 (N.D.N.Y. 1986) ("in some instances, a special facility will constitute the least restrictive environment for a particular handicapped child").

In the instant case the degree to which DCPS's IEP and proposed placement satisfy the mainstreaming goal of the Act must be considered in tandem with the Act's principal goal of ensuring that the public schools provide handicapped children with a free appropriate education. _See Wilson v. Marana Unified School Dist.,_ 735 F.2d 1178, 1183 (9th Cir 1984)  A major part of the task of local and state officials in fashioning what they believe to be an effective program for the education of a handicapped child is the selection of the methodology or methodologies that will be employed.  "The primary responsibility for formulating the education to be accorded a handicapped child, and for choosing the educational method most suitable to the child's needs, was left by the Act to state and local educational agencies in cooperation with the parents or guardians of the child." _Rowley,_ 458 U.S. at 207 quoted in _Northwest R-1 School District,_ 813 F.2d at 164.

In the instant case the record reveals that the DCPS city-wide hearing impaired ("HI") program is housed at Key which is a general education elementary school for students from pre-K through 5th grade. (Tr. at 78) The HI program at Key, which began during the 2003-2004 school year, is designed to provide services to students who have the disability of HI.  (Tr. at 62-63)  The program is housed in a general education school so that students in the program can be mainstreamed into general education classrooms with

non-disabled peers.  (R at 49)  (Tr. at 63)  Until their level of proficiency is sufficient to

assess the core academic general education curriculum the student's specialized

instruction is provided by a certified special education teacher.  The special education

teachers at Key teach regular academic skills in math, reading, social studies and science

at a modified speed and to the student's ability based on language, speech and auditory

levels.  (Tr. at 80)  The teachers focus daily on auditory development, speech production

tasks and teaching the students language to help them learn academics. (Tr. at 80) The

program is designed to educate students in language and other areas so they eventually

can be mainstreamed. (Tr. at 129-130)

     The classrooms at Key are equipped with a sound field system which amplifies the

teacher's voice so it can be heard by all students in any part of the classroom. (Tr. at 80-

81)  When an HI student is in a mainstreamed classroom an FM system is used to amplify

the teacher's voice to only the HI student wearing a devise that receives the FM signal.

(Tr. at 81)    Key also provides the students with speech/language therapy from a certified

Speech and Language professional. (Tr. at 107-108)

     Pamela Owens, who has an M.A. in special education and clinical psychology and

currently works for DCPS as non-public day coordinator testified that she observed the

student at River in a classroom setting and also reviewed her latest speech and language

evaluations which were presented at the MDT meeting.  (Tr. at 57-58)  Ms. Owens

testified that the student's primary disability is HI and as a result she had many other

difficulties and developmental delays. Ms. Owens further testified as to why the student's

needs would best be met at a specialized special education setting.  (Tr. at 46, 47, 54).[3]

In a specialized special education setting the student could be served by a hearing

impaired teacher and also receive speech and language therapy.  (Tr. at 54)

Ms. Owens further testified that DCPS' Notice of Placement, which placed the

student out of general education, was based in part "from the recommendations from the

whole team, including River School.  They told me that she needed 25.5 hours of

specialized instruction."  (Tr. at 63) The student's River school classroom teacher also

informed Ms. Owens that the student was working on a pre-primer level, while the other

students were working on the second grade level  (Tr. at 65-66) Based in part on this

information Ms. Owens opined that an out of general education setting was the most

appropriate placement and thus the least restrictive environment, because the student was

working two grades below her classmates and not receiving the benefit of being in a

general education setting,  (Tr. at 65)  "She would benefit from being—this would be her

least restrictive environment, putting her in a setting where she could work on her grade

level, where she would be able to benefit the most from her education that she is

receiving.  She is not going to be able to benefit if she is not getting the instruction on her

grade level."  (Tr. at 65)

Ms. Amy Roberts, a DCPS teacher at Key, also testified as to why Key would be an

appropriate placement for the student.  Ms. Roberts has an undergraduate degree in

rehabilitation disability studies with an emphasis on communication disorders.  Ms.

Roberts received a master's degree in education from the Smith College Clarke School

for the Deaf.  The program consisted of classes in speech development, language

---

[3] While Ms. Owens does not have a degree in either speech and language or audiology, she brought people specialized in those areas to the MDT meeting, so they could review the student's reports and listen to what her teachers had to say about the student to help make an informative placement decision.  (Tr. at 56-57)

development, auditory skills development, as well as education courses.  (Tr. at 76)  A main component of the program was working with students with cochlear implants and Ms. Roberts has worked with such students in the past.  (Tr. at 77)

Ms. Roberts testified that the Key school currently has three hearing impaired teachers for twelve students.  (Tr. at 78)  The students who attend the hearing impaired program are those students with hearing impairment listed as their disability and who need intensive speech, language and auditory skill development every day.  (Tr. at 79)

Besides attending classes in speech and audiology, the students are also taught academic subjects, following the same curriculum as a regular classroom, and have mainstreaming time, which includes classes in physical education, library, computers and the arts.  (Tr. at 83, 88)  The minimum amount of time that a special education student is mainstreamed is four hours a week.  (Tr. at 106)  As a student progresses he/she will spend more time in a mainstream environment.  (Tr. at 86)

The goal of the program is to mainstream the students into academic classes.  However, before a student is mainstreamed the school wants to ascertain that the student is ready—is able to understand the teacher's spoken language and can succeed independently in the classroom.  (Tr. at 83, 88)  After a student is mainstreamed the special education teacher continues to provide support to the student whether by ascertaining that the regular teacher is using the FM properly; making sure that the students are paying attention and responding to questions; and determining from their teacher whether the student needs any pre-teaching.  (Tr. at 87-88)

Ms. Roberts attended the student's IEP meeting on November 17, 2004.  (Tr. at 89)  Prior to the meeting she observed the student at the River school, having previously

14

reviewed the student's audiogram and her speech and language evaluations.  (Tr. at 89-90) From those records Ms. Roberts learned that the student's "speech and language scores were significantly below her typical age peers", a fact she kept in mind as she observed the student.  (Tr. at 91)  Ms. Roberts observed the student at River for "most of [a] morning" in October, 2004 and also spoke with her classroom teacher.  (Tr. at 91-92, 110)

At the time Ms. Roberts observed the student the teacher was in front of the class instructing and the student was sitting on someone's lap, who Ms. Roberts believes was the speech pathologist.  (Tr. at 92)  Ms. Roberts concluded that the student "wasn't getting the instruction from the teacher who was speaking.  She wasn't attending to her. She was attending to the woman who was with her, who she was sitting on the lap of….I'm sure that she was receiving some idea of what was going on, but she was not getting it from the speaker."  (Tr. at 93)

After observing the student in a classroom setting and reviewing all her evaluations Ms. Roberts attended the IEP meeting, as part of the DCPS team, on November 17, 2004. The River school personnel provided the goals and objectives for the student, which DCPS accepted because they made sense based on what Ms. Roberts had seen of the student and of her evaluations.  (Tr. at 95)

Ms. Roberts testified that her review of the evaluations showed that the student's scores were significantly below the test scores of students her age.  "I believe on all the tests, most of the tests, 99 percent of kids her age tested better."  (Tr. at 96)  Ms. Roberts also testified that the student was not progressing at a greater rate given that she had a cochlear implant.  (Tr. at 97)  "[C]hildren with a cochlear implant should progress

quickly if they have the right follow up, including audiological follow-up, educational

follow-up."  (Tr. at 97)

Based on her knowledge of the student and on the goals and objectives that were

decided by the MDT team Ms. Roberts testified that the student "should have an

intensive program, with speech and language and audition tied into the program all the

time.   She needs a lot of individualized instruction, I feel like; small group with

repetition all the time, and really concentrated follow- up on how she is progressing."

(Tr. at 97-98)  Ms. Roberts further testified that Key could provide such a program.  (Tr.

at 98)

Ms. Roberts also testified that attending Key would actually be less restrictive than

her current school setting because presently the student was not learning like the other

students.  (Tr. at 98)   "[The student] was learning primarily from someone who was

giving the information, giving it to her.  She wasn't learning from the instructor, where

everyone else was listening to the instructor."  (Tr. at 99)  On the other hand, if the

student attended Key she would learn from the instructor.

Ms. Roberts was trained to teach speech and language to deaf students and thus is

able to do it all day long without the presence of a speech pathologist. Additionally, a

student at Key would also receive the services of a speech pathologist on a weekly basis.

(Tr. at 111-112)  On the other hand a speech pathologist at River may or may not have

training in working with deaf children.  (Tr. at 112)

John Schmidt, the supervisor of the hearing and vision impaired program in DCPS

testified on behalf of DCPS as an expert witness. Mr. Schmidt has a bachelor's degree in

speech pathology and audiology and a master's degree in special education with an

emphasis in auditory oral. (Tr. at 127) Mr. Schmidt was the listening skills specialist at the Utah Schools for the Deaf and Blind for approximately five years and developed a listening skills curriculum that is still in use today. (Tr. at 127-128) Mr. Schmidt subsequently became the Director of the Utah Schools for the Deaf and Blind, Salt Lake City program, serving in that position for 21 years. Mr. Schmidt then worked with program assistance projects, which included developing, enhancing and starting new auditory oral programs in Idaho, Denver, Colorado and Texas. (Tr. at 128) Mr. Schmidt came to the District of Columbia when the hearing impaired program began at DCPS approximately two years ago. (Tr. at 128)

Prior to the hearing Mr. Schmidt reviewed the student's latest IEP and the speech pathologist's report. (Tr. at 130) Mr. Schmidt opined that the student was "functioning between a two and a half and three year old level in both expressive and receptive language." (Tr. at 131-132)[4] Mr. Schmidt further testified that students with cochlear implants usually experience one year's growth for one year of school. (Tr. at 132) That has not been the case with this student, who received the cochlear implant in 2001, and has participated in a general education program and received speech therapy since 2000. (Tr. at 135-136)

Mr. Schmidt further opined that the student would not benefit from being in a mainstream class full time at this time. "I feel she needs extensive intervention in relationship to language and speech by a teacher of the deaf who is trained in working with a student with a hearing loss." (Tr. at 133) The background of a teacher trained in the area of teaching children with a hearing impairment is based on the Ling method, which has been a nationally recognized program for teaching speech to the deaf. (Tr. at

---

[4] At the time of the hearing the student was six, going on seven.

137) Their background is also in oral habilitation, whereas most speech therapists have a background in rehabilitation rather than habilitation. (Tr. at 137)   "The primary emphasis that happens with a teacher of the deaf is that language and speech is learned through an auditory process.  That is why audiology is so important….Most of your SLPs are not trained in developing language and speech through the auditory process." (Tr. at 157)  At River the student would be taught in a general education setting with the additional services of a speech therapist.  The student would not be taught by a teacher trained in working with students with a hearing loss.

Mr. Schmidt further opined that Key represented a less restrictive environment than the mainstream classes at River.  "[H]er needs would be better met with a certified teacher of the deaf, and to work on her language and speech skills, and I think that peer models there are good peer models….I think that she is going to face a lot of frustration where she is currently because of the academic level and because of the language level that she has currently.  I think Key would help eliminate some of that." (Tr. at 140)

34 CFR Sec. 300.550 provides:

DCPS shall ensure—
(1) That to the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are-non-disabled; and
(2) That special classes, separate schooling or other removal of children with disabilities from the regular educational environment occurs only if the nature of severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

Here, the HO apparently only focused on that part of the regulation which requires that students with disabilities be educated with children who are non-disabled.  The HO failed to take into account that part of the regulation which does not require

mainstreaming if "<u>such education in regular classes with the use of supplementary aids</u> <u>and services **cannot** be achieved satisfactorily</u>" (*Id.*, emphasis added), despite acknowledging that "meeting the LRE requirement does not require that a disabled child be educated in the same classroom with non-disabled children in all circumstances.  The placement must be appropriate."  (R at 12)

Here DCPS presented evidence that the student is hearing impaired, that she wore hearing aides until 2001 when she received a cochlear implant and that she was classified as hearing impaired until this past IEP.   John Schmidt, the supervisor of the hearing and vision impaired program in DCPS, who testified as an expert witness with more than 20 years of experience with deaf pupils, stated that students with cochlear implants usually experience one year's growth for one year of school, but that this six year old student was "functioning between a two and a half and three year old level in both expressive and receptive language." (Tr. at 131-132)  The student's Speech and Language Evaluations from when she was six indicate that she is well below the average level for children her age, so that 98% - 99% of children earned higher scores than this student.  (R. at 42-48)

 Ms. Roberts, a teacher at Key, who also testified on behalf of DCPS, stated that children with a cochlear implant "should progress quickly if they have the right follow up, including audiological follow-up, educational follow-up" but that this student was not progressing at the appropriate rate.  (Tr. at 96)

The record further reveals that at the time of the hearing the student had been attending the River school for more than four years.  Thus it is apparent that the student is not benefiting from the general education setting despite all the supplementary aids and

services that have been provided to her.  Accordingly, the River school is not the least restrictive environment if it does not provide the child with a FAPE.

Further, it would appear that according to the recommendations of Ms. Kimberlee Pope, Speech-Language Pathologist for River, whose evaluations DCPS introduced into evidence, that Key would be a more appropriate placement for the student.[5]  The most glaring recommendation that could not be met by River was that which called for  "[a] low student-to teacher ratio is imperative for [the student] to learn new information and have ample opportunities to participate."  (R at 50)

DCPS presented evidence that at Key there were four students in pre-K, two in the next level, and six in the following level, for a total of twelve students in the entire program.  (Tr. at 78, 145-146)  On the other hand, Ms. O'Leary-Kane, a witness for defendants, testified that "[i]n [the student'] classroom there are 12 students all together and then nine are typical students."  (Tr. at 210) Thus there would be more children in one of the student's classes at River than there would be at Key.  It would only be when the student was in the general education setting, which according to DCPS' IEP would be approximately 2% of the time that she would be in a larger group.

DCPS not only presented evidence as to why River was not an appropriate placement, but also why Key was. In fact the HO found that "DCPS put forth credible testimony that it uses a viable method of educating students with HI and SLI combined disabilities in a quasi inclusion model with efforts to quickly transition students according to their abilities to full time mainstreaming."  (R at 12)

---

[5] While the DCPS witnesses testified how all the recommendations included in Ms. Pope's evaluations could be met at Key, the undersigned is only addressing one of the nine in this memorandum, in the interest of brevity.

The HO acknowledged that the student is hearing impaired, that "[w]ithout the cochlear implant she is deaf." (R at 12)  The HO further acknowledged that the student was incapable of accessing and benefiting from a general education setting without the support of a full time speech pathologist in the classroom and that the major dispute in the case "is how the student's multiple disabilities are best addressed." (R at 12)  The HO then proceeds to correctly cite the law that "[i]t is generally held that the selection of educational philosophies rests with the educational institution.  '[O]nce a court determines the requirements of [Individuals with Disabilities Education] Act have been met, questions of [educational] methodology are for resolution by the States.'[6]  The mainstreaming requirement does not give parents the right 'to compel a school district to provide a specific program or employ specific methodology in providing for the education of their disabled child.'  Schools have the power to provide disabled children with an education they consider more appropriate than that proposed by the parents."[7]

Nonetheless, despite finding that DCPS presented "credible evidence" that its method of educating HI students at Key was viable, that the selection of educational philosophies rests with the educational institution, and that schools have the right to provide a disabled student with an education they consider more appropriate than that proposed by the parents, he incredibly finds that because DCPS did not present enough witnesses, that he would find that River was an appropriate placement. (R at 13-14)  This same HO, in a subsequent decision dated June 24, 2005,[8] where the issue was again the appropriateness of Key as a placement, "conclude[d] that in proposing the student's

---

[6] 4-10 EDUCATION LAW Sec. 10.03 citing Board of Educ. V. Rowley, 451 U.S. 176, 208, (1983) and Barnett v. Fairfax County Sch. Bd., 721 F. Supp. 757 (E.D. Va. 1989), aff'd 927 F.2d 146 (4th Cir.) and Hudson ex rel. Tyree v. Wilson, 828 F.2d 1059, 1178, 1182 (4th Cir. 1987).
[7] Visco v. School Dist of Pittsburgh, 684 F. Supp. 1310, 1312, 13 (W.D. Pa. 1988).
[8] In the Matter of Sarinah Wahl vs DCPS

placement at Key DCPS offered the student a FAPE." (Ex. 1 at 16)  In the *Wahl* matter

the facts were comparable to those in the instant case:  The student was a six year old

hearing impaired student with a cochlear implant.  The student enrolled at the River

school in April 2004.  An MDT meeting was held for the student on September 15, 2004.

The IEP drafted at the MDT meeting prescribed 21.5 hours of specialized instruction to

be provided in an out of general education setting.  As here, the parent did not object to

the goals and objectives of the IEP, but did disagree with the placement at Key.  Despite

the fact that the parent again presented more witness than DCPS, the HO found Key

Elementary school to be an appropriate placement.[9]

    The HO was clearly wrong in his decision in the instant case and this honorable

court should reverse the HOD and grant plaintiff's motion for summary judgment.

*Rowley* and its progeny leave no doubt that parents, no matter how well-motivated, do not

have a right under IDEA to compel a school district to provide a specific program or

employ a specific methodology in providing for the education of their handicapped child.

*See* <u>*Rowley,*</u> 458 U.S. at 207.  Further, the courts are clear that the mainstreaming

provision of the IDEA was not meant by Congress to be implemented in an unqualified

manner.

<u>**CONCLUSION**</u>

    Until 2004 DCPS did not have a special program for the hearing impaired.

Consequently many of the DCPS students with hearing impairments attended the River

school. However, now that an appropriate public placement for the hearing impaired

---

[9] In <u>The Matter of Amara Hawkins v. DCPS,</u> a decision dated May 23, 2005, a different hearing officer also found that Key was an appropriate placement.  There, as here, the child was six years old, enrolled at the River school and with an IEP that prescribed an out of regular education 98% of the time.  (Ex. 2)

exists at Key, if it is determined, as it should be here, that Key can meet the unique needs of the student, then the student should be placed there. DCPS is bound by D.C. Code Sec. 38-2501 to first place a student at a public school if the public placement is appropriate.

Apparently, parents who have become accustomed to having their children attend a private school at public expense are now contesting the classification of their child— hearing impaired or speech and language delayed. As Mr. Schmidt opined "[t]here seems to be something happening at River that they want to classify these children as speech and language delayed rather than hearing impaired. It is the first time I have seen this happen nationwide and the only reason I can figure is that by classifying them as speech and language delayed, it makes it easier to keep those kids at Key or at River." (Tr. at 150)

Here, there is no question that the student is hearing impaired and scant evidence that the student would be detrimentally impacted by being at the placement proposed by DCPS. DCPS presented credible evidence that the program at Key has a viable program that could meet the needs of this student. Accordingly, for these reasons and those stated above, this honorable court should find that the hearing officer erred when he concluded that Key was not an appropriate placement for the student, grant plaintiff's motion for summary judgment and grant plaintiff the relief requested in its Complaint.


Respectfully submitted,

ROBERT J. SPAGNOLETTI
Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General for the District of Columbia


/s/ Edward P. Taptich
EDWARD P. TAPTICH [012914]
Chief, Equity, Section 2



/s/ Maria L. Merkowitz
MARIA L. MERKOWITZ [312967]
Senior Litigation Counsel
441 4th Street, N.W.
Sixth Floor South
Washington, DC 20001
(202) 442-9842
FAX  -  (202) 727-3625


November 14, 2005

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THE DISTRICT OF COLUMBIA     :
:
:
:     Civil Action No. 05-1309
     Plaintiff,     :     (RJL)
:
v.     :
:
JEPPSEN     :
:
     Defendant     :
_____:

## PLAINTIFF'S STATEMENT OF MATERIAL FACTS

1.  The student is a seven year old child who has been determined to be a child with a disability with a profound hearing loss.  The student wore hearing aides until 2001 when she received a cochlear implant. (R at 41) (Tr. at 71-72)

2.  The student was enrolled in the River School program in September 2000, and was in attendance at that school at the time of the hearing.  (R at 2)

3.  At the time the student began her enrollment at River, DCPS did not have a public program for the hearing impaired. By September 2004, DCPS had such a program in place housed at Key.  (Tr. at 49)

4.  DCPS convened an MDT/IEP meeting for the student on November 17, 2004. (R. at 24)

5.  The student's primary disability classification in her previous IEP was hearing impaired ("HI"  (Tr. at 52) (R at 71)

6.  On November 17, 2004, DCPS drafted an IEP for the student that included the following weekly services: 25.5 hours of specialized instruction, 1 hour of speech/language ("S/L") therapy, and 1 hour of audiology.  (R. at 24)

7.  The personnel from the River school presented the goals and objectives which were incorporated into the IEP.  (Tr. at 50-51)

8.  The DCPS MDT team members considered whether a general education placement would be appropriate but rejected it because "[The student] is not working on grade level and needs [specialized instruction] resource."  (R. at 35)

9.  The student has attended the River school for more than four years but her speech and language scores are significantly lower than other students her age, (Tr. at 91, R. at 42-48)

10. At the conclusion of the meeting DCPS issued a Prior Notice of Placement for the student to be outside the general education setting and for her placement location to be changed from River to Key.  (R at 40)

11.  DCPS' Notice of Placement was based in part from the recommendations from the -River School, which informed DCPS that the student needed 25.5 hours of specialized instruction."  (Tr. at 63)

12. As a result of the change in placement the parents filed a Request for Due Process Hearing on November 23, 2004.  (R. at 130)

13. In a decision dated March 28, 2005, the Hearing Officer concluded that "DCPS did not sustain its burden of proof in demonstrating that the proposed change of placement was appropriate."  (R. at 12)  The HO found that DCPS'

proposed placement of Key Elementary school was not the least restrictive environment ("LRE") in which to educate the student, in violation of 34 CFR 300.550.

14. The HI program at Key, which began during the 2003-2004 school year, is designed to provide services to students who have the disability of hearing impaired ("HI").  (Tr. at 62-63)

15.  The program is housed in a general education school so that students in the program can be mainstreamed into general education classrooms with non-disabled peers.  (R at 49)  (Tr. at 63)

16. The special education teachers at Key teach regular academic skills in math, reading, social studies and science at a modified speed and to the student's ability based on language, speech and auditory levels.  (Tr. at 80)

17. The classrooms at Key are equipped with a sound field system which amplifies the teacher's voice so it can be heard by all students in any part of the classroom. (Tr. at 80-81) When an HI student is in a mainstreamed classroom an FM system is used to amplify the teacher's voice to only the HI student wearing a devise that receives the FM signal.  (Tr. at 81)

18. Key also provides the students with speech/language therapy from a certified Speech and Language professional. (Tr. at 107-108)

19. Ms. Owens, the DCPS non-public day coordinator, testified as to why the student's needs would best be met at a specialized special education setting. In a specialized special education setting the student could be served by a hearing impaired teacher and also receive speech and language therapy.  (Tr.

at 54)    The student currently was working two grades below her classmates and not receiving the benefit of being in a general education setting,  (Tr. at 65)

20. Ms. Amy Roberts, a DCPS teacher at Key, also testified as to why Key would be an appropriate placement for the student.  The Key school currently has three hearing impaired teachers for twelve students.  (Tr. at 78)  The students who attend the hearing impaired program are those students with hearing impairment listed as their disability and who need intensive speech, language and auditory skill development every day.  (Tr. at 79)  Besides attending classes in speech and audiology, the students are also taught academic subjects, following the same curriculum as a regular classroom, and have mainstreaming time, which includes classes in physical education, library, computers and the arts.  (Tr. at 83, 88)  As a student progresses he/she will spend more time in a mainstream environment.  (Tr. at 86)

21. Prior to the IEP meeting held on November 17, 2004,  Ms. Owens observed the student at the River school for most of a morning and spoke with the student's teacher.  (Tr. at 91-92, 110)  Ms. Owens also reviewed the student's audiogram and her speech and language evaluations.  (Tr. at 89- 90)

22. The student's speech and language scores were significantly below her typical age peers.  (Tr. at 91) 98%-99% of pupils the student's age scored higher than the student.  (R. at 42-48)

23. Usually children with a cochlear implant progress more quickly than the student if they have the right follow up, including audiological and educational follow-up.  (Tr. at 97)

24. Ms. Roberts testified that the student "should have an intensive program, with speech and language and audition tied into the program all the time.   She needs a lot of individualized instruction, I feel like; small group with repetition all the time, and really concentrated follow- up on how she is progressing."  (Tr. at 97-98)

25. Ms. Roberts further testified that Key could provide such a program.  (Tr. at 98)

26. Ms. Roberts also testified that attending Key would be less restrictive than her current school setting because presently the student was not learning like the other students.  (Tr. at 98)

27. John Schmidt, the supervisor of the hearing and vision impaired program in DCPS testified on behalf of DCPS as an expert witness.

28. Mr. Schmidt opined that the student was "functioning between a two and a half and three year old level in both expressive and receptive language."  (Tr. at 131-132)

29. Mr. Schmidt further testified that students with cochlear implants usually experience one year's growth for one year of school. (Tr. at 132)  That has not been the case with this student, who received the cochlear implant in 2001, and has participated in a general education program and received speech therapy since 2000.  (Tr. at 135-136)

30.  Mr. Schmidt further opined that the student would not benefit from being in a

mainstream class full time at this time.

31. Mr. Schmidt further opined that Key represented a less restrictive

environment than the mainstream classes at River.


Respectfully submitted,

ROBERT J. SPAGNOLETTI
Attorney General for the District of Columbia


GEORGE C. VALENTINE
Deputy Attorney General for the District of Columbia


/s/ Edward P. Taptich
EDWARD P. TAPTICH [012914]
Chief, Equity, Section 2


/s/ Maria L. Merkowitz
MARIA L. MERKOWITZ [312967]
Senior Litigation Counsel
441 4th Street, N.W.
Sixth Floor South
Washington, DC 20001
(202) 442-9842
FAX  -  (202) 727-3625


November 14, 2005