(In the Matter of SW  DOB: 4/10/90  HOD: June 24, 2005)

# DISTRICT OF COLUMBIA PUBLIC SCHOOLS
## Office of Compliance
### CONFIDENTIAL
## Coles B. Ruff, Jr., Due Process Hearing Officer

| | |
|---|---|
| In the Matter of Sarinah Wahl )<br>Date of Birth: April 11, 1999 )<br>)<br>Petitioner, )<br>)<br>v. )<br>)<br>District of Columbia Public Schools )<br>("DCPS" or "District") )<br>Home School: Mann ES )<br>Respondent )<br>Counsel for Student: | IMPARTIAL DUE PROCESS<br><br>HEARING OFFICER'S DECISION<br>Hearing Dates: January 11, 2005<br>April 20, 2005<br>Held at: 825 North Capitol St. NE<br>Washington, DC<br><br><br><br><br>Douglas Tyrka, Esq.<br>Carolyn Houck, Esq.<br>5505 Connecticut Ave. NW #174<br>Washington DC 20015 |
| Counsel for DCPS: | Jack Schreibman, Esq.<br>Office of General Counsel<br>825 North Capitol St. NE<br>Washington, DC  20002 |

## JURISDICATION:

A Due Process Hearing was convened on January 11, 2005, and concluded on April 20, 2005, at the headquarters of the District of Columbia Public Schools, 825 North Capitol Street, NE, Washington, DC 20002, in response to a hearing request submitted by counsel for the student and parent filed June 15, 2004. The hearing was conducted and this decision was written pursuant to the *Individuals with Disabilities Act* (I.D.E.A.), P.L. 101-476, as amended by P.L. 105-17, the Rules of the Board of Education of the District of Columbia and the DC Appropriations Act, Section 145, effective October 21, 1998.

## DUE PROCESS RIGHTS:

The parent's counsel waived a formal reading of the due process rights.

## SUMMARY OF THE RELEVANT EVIDENCE:

The Hearing Officer considered the representations made on the record by each counsel, the testimony of the witness(es) and the documents submitted in the parties' disclosures (SW 1-11 and DCPS 1-8) which were admitted into the record.[1]

---

[1] The evidence that is the source of the finding of fact is noted within a parenthesis following the finding.

1

(In the Matter of SW  DOB: 4/10/90  HOD: June 24, 2005)

## FINDINGS OF FACT:

- The student is currently six and has a profound hearing impairment which has been modified with a cochlear implant she received in April 2004. The student's father (parent) enrolled the student at the River School (River) in April 2004 based on the recommendation of Johns Hopkins Hospital where the implant surgery was completed. The student attended through July 2005, the end of River's school year. She returned in September 2004 at the beginning of the following school year and is still attending River. (Parent's testimony)

- On May 24, 2004, the parent attempted to register the student at her local school Mann Elementary (Mann) and requested special education services. He informed the principal of the student's hearing impairment. The principal indicated it was too late to register the student for the 2004-05 school year and the student could not be registered until after July 12, 2004, because of change in the DCPS computer system. The principal instructed him return after that date. (Parent's testimony)

- The parent returned on July 19, 2004, and officially registered the student. The principal informed the parent that the student's services would probably be provided at the Key School (Key) where the program for hearing impaired students was housed. She instructed the parent to deliver the student's evaluations to the DCPS Care Center. (Parent's testimony)

- Within a few days of registering the student the parent provided DCPS two independent evaluations: a psychological and speech/language evaluation conducted in December 2003 and May 2004 respectively. The psychological evaluation indicated the student had a composite IQ score of 139, in the 99th percentile. The speech/language evaluation indicated a moderate to severe delay in receptive language and a severe delay in expressive language. (SW 3, 4)

- Ms. Kathie Thompson, the DCPS case manager received the student's evaluations on July 27, 2004, and contacted the parent who was out of town at the time. DCPS was able complete its evaluation of the student in August 2004 once the parent and student returned. (Ms. Thompson's testimony, DCPS 6)

- Dr. Marcia Stuart, DCPS psychologist, reviewed the independent psychological evaluation and administered the Woodcock Johnson III. The assessment indicated the student's academic age equivalency was 6.2 years.[2] The student's reading comprehension, broad math and overall academic functioning were all in the high average range. As result of this assessment and the psychological evaluation Dr. Stuart concluded the student did not have any sort cognitive/ intellectual or learning disability. (Dr. Stuart's testimony, DCPS 6)

---

[2] The student was 5 years and 4 months of age at the time of the evaluation.

(In the Matter of SW  DOB: 4/10/90  HOD: June 24, 2005)

- Ms. Thompson and Dr. Stuart observed the student at River in September 2004. Dr. Stuart observed that the student was "acquiring skills at age appropriate level," and was not singled out for any individual help from the teacher. (Dr. Stuart's testimony)

- Ms. Thompson looked at possible public placements for the student including Mann and the program for the hearing impaired at Key. (Ms. Thompson's testimony)

### *The IEP and MDT/IEP Meeting:*

- DCPS convened the multi-disciplinary team (MDT) meeting on September 15, 2004. The MDT included the parent, his educational advocate, the student's teacher and related service providers from River, the DCPS evaluators, a DCPS audiologist, a DCPS special education and a DCPS general education teacher. (DCPS 2)

- The MDT first considered whether the student would receive services under a "504" plan or would be determined eligible for special education services. Ms. Thompson stated the student could be served under a "504" plan. Ms. Jean Tebinka, the DCPS audiologist who participated in the MDT, expressed her opinion that the student should be found eligible. (Ms. Tebinka's testimony)

- At the parent's behest Ms. Thompson shared part of the report prepared by the DCPS physician, Dr. Taylor Davis, which indicated the student was "appropriate for the Multiple Disabilities classification (Hearing Impairment and Speech Language Impairment). The report also recommended that the student "continues to require auditory habilitation sessions and speech/language therapy... and should continue to participate in an inclusive classroom with appropriate related services." The entire MDT then agreed the student was eligible for special education services as a student with a multiple disabilities classification. (Parent's testimony, SW 6, DCPS 2)

- Following the eligibility determination the MDT developed the student's IEP. All members of the MDT agreed to extensive communication goals and short term objectives, and math and reading goals of at least nine months growth during the school year.[3] However, there was disagreement between the DCPS members and the parent and River staff as to how the specialized instruction and speech language services would be provided. (DCPS 1, 3)

- The DCPS members believed the student's instruction should be provided by a special education teacher and the individualized speech language services should be limited to five hours weekly. The parent and River staff expressed the desire

---

[3] Some the short term objectives under the communication goals indicated the student should demonstrate certain skills and abilities with "typically developing peers."

(In the Matter of SW   DOB: 4/10/90   HOD: June 24, 2005)

> that the IEP reflect, consistent with the methodology at River, instruction provided by a general education teacher and a fulltime speech language pathologist in the classroom during instruction. The River School staff indicated the student did not need any instruction from a special education teacher. The disagreement was critical to the placement setting and the least restrictive environment (LRE) in the IPE. (DCPS 1, 3)

- The finalized IEP reflected the DCPS position and prescribed the student receive the following weekly services: 21.5 hours of specialized instruction provided by a special education teacher, 5 hours of speech services, and 1 hour of audiological services. The IEP also indicated with regard to the LRE that the student needed of a setting with "a low student to teacher ratio" and a special education setting 85% of the time. The IEP rejected "general education" and "combination" setting and accepted "out of general education" setting. The parent did not disagree with the goals and objectives in the IEP; however, as a result of the disagreement about who would provide specialized instruction and the setting in which the services would be provided the parent indicated on the IEP that he did not agree with the IEP. (Parent's testimony, DCPS 1)

- The MDT discussion then turned to the specific placement. DCPS recommended the hearing impairment program at Key. The DCPS representatives indicated that the student would be "mainstreamed" into general education classes at Key when it was appropriate. The DCPS members of the team believed that it was best for the student to first receive the specialized instruction from a special education teacher to make a solid transition into a new setting and then be mainstreamed. The related services could be pull-out or delivered in the classroom depending what was best for the student. (Ms. Thompson's testimony)

- The parent and River staff indicated that the student should be in an "inclusion" setting, not "mainstreamed".[4] They expressed their opinion that placing the student in a more restrictive setting like the Key program, in which the student would be in a "self contained" special education classroom, would not fully meet her goals and objectives. The DPCS staff disagreed and issued a prior notice of placement for the student in the "Hearing Impaired Class" at Key. (DCPS 3, 4)

*Placements:*

<u>The Key Program</u>

- The DCPS city-wide hearing impaired (HI) program is housed at Key which is a general education elementary school for students from pre-K through 5th grade. The Key program is designed for elementary school students who are deaf or hard

---

[4] "Mainstreaming" is the term generally used to describe placing disabled students with non-disabled peers with no accommodations. "Inclusion" describes placing disabled students with non-disabled peers with accommodations. A "self contained" setting describes placing disabled students only with disabled peers. (Stipulation)

4

(In the Matter of SW   DOB: 4/10/90   HOD: June 24, 2005)

of hearing. The teachers in the program are certified teachers of the deaf and hard of hearing trained in auditory language skills. DCPS employs the following personnel for its hearing impaired programs one of which is located at Key: five teachers, three of whom at are Key, 1 itinerant teacher, and 4 audiologists. (Mr. Schmidt's testimony)

- The Key program stresses aural language through academics in the classroom. The program uses the Ling method of teaching speech to death and hard of hearing students to determine what speech sounds are missing for the student and those are targeted and addressed. (Mr. Schmidt's testimony)

- A distinct advantage of the classroom teacher being specifically trained to teach the death and hard of hearing is that the teacher can monitor a student's listening skills and speech development throughout the day. Even though this student has high academic abilities the teacher indicated she can provide challenging academic development for the student. (Ms. Robert's testimony)

- The audiologist at Key is available to provide auditory stimulation, develop listening skills and to ensure that the student's hearing equipment is working properly. (Ms. Tebinka's testimony)

- The Key program is housed in a general education school so that students in the program can be mainstreamed into general education classrooms with non-disabled peers. Until their level of auditory and language proficiency is sufficient to access the core academic general education curriculum the student's specialized instruction is provided by a certified special education teacher who has been specifically trained to teach children with HI/SLI disabilities. (Ms. Robert's testimony, Mr. Schmidt's testimony)

- There are currently two classrooms in the Key program, one Pre-K and one kindergarten/first grade classroom. The students in the program receive core academic instruction in a classroom only with other hearing impaired students. Most students attend classes with non-disabled peers for the special subject areas which include Art, Physical Education, Music, Library, Drama and Computers. In these special classes the general education teachers use a microphone and an amplification system so that disabled students can hear and fully participate in the class. Usually during lunch and recess periods a special education teacher or services provider is available to assist the special education student's with peer and adult communication. (Ms. Robert's testimony)

- When a student's skills are developed sufficiently he or she will move into general education classes with general education students for core academic subjects. These students when mainstreamed will have some support from a teacher of the hearing impaired and/or a related service provider in the general education classroom to the extent necessary. (Ms. Tebinka's testimony, Ms. Robert's testimony)

(In the Matter of SW  DOB: 4/10/90  HOD: June 24, 2005)

- The classroom teacher helps develop students' language skills as a critical part of the student's instruction. When the students have a command of auditory, listening and language skills they are mainstreamed. The mainstreaming is done gradually to ensure that students have less difficulty and will know how to request assistance if needed. The auditory/aural program with this emphasis to designed to give the students in the program the necessary skills to mainstream into their neighborhood schools as quickly as possible. The eventual goal is to mainstream a student into his or her home school. (Ms. Robert's testimony)

- The special education classrooms at Key are equipped with a sound field system which amplifies the teacher's voice so it can be heard by all students in any part of the classroom. Most students wear a hearing aide and use the sound field system. When a HI student is in a mainstreamed classroom an FM system is used to amply the teacher's voice to only the HI student wearing a devise that receives the FM signal. (Ms. Robert's testimony)

- The student's speech/language evaluation indicated the student was at the time 5 years 2 months of age and tested at 2 years 9 months age equivalency in verbal comprehension and expressive language. Based upon these evaluation results the student is not yet ready for mainstreaming until her language skills have been more fully developed. (Ms. Robert's testimony, Mr. Schmidt's testimony)

- Given the student's hearing loss, delay in language and her implant, the certified teachers' goal would be to mainstream her as quickly as possible. The program will first provide her a fulltime environment and then mainstream her. The peer communication is an important component in the transition period. The program with teachers of the deaf is intense to bring the student's language level up as quickly as possible to the point she can be mainstreamed. (Dr. Schmidt's testimony)

- During the 2004-05 school year the parent's educational advocate visited and observed the Key program. She observed that the majority of the students in the program were mainstreamed for the special subjects and the younger students were mainstreamed for their recess period. She observed that during physical education, lunch and recess the hearing impaired students chose to remain segregated from the other students when given a chance to interact independently. (Ms. Millis' testimony)

- The advocate also observed two students being mainstreamed in a core academic class with a general education teacher. The special education teacher had determined their language skills were sufficiently developed to be mainstreamed. The advocate observed that the students had no additional supports in the classroom. At the time of the observation the students did have preferential seating but were at a distance from the teacher. (Ms. Millis' testimony)

## The River School

- River is a full time general education school that serves students from age 18 months to third grade with varying degrees of hearing loss. 90% of the students are non-disabled students. The remaining students use either a hearing aide or a cochlear implant to remediate their hearing loss. The school has been specifically designed both physically and programmatically for the hearing impaired students to provide them an environment in which they can develop with non-disabled peers. River's teaching model uses a full time general education teacher and a full time speech/language pathologist to co-teach both the disabled students and their non-disabled peers in a general education classroom. (Ms. O'Leary Kane)

- The speech pathologist and teacher confer on what is being presented in the classroom and plan the accommodations, including pre-teaching and other methods to assist the hearing impaired students to access the curriculum. River has some classes instructed by teachers of the deaf and hard of hearing. These teachers do nothing different at River than the other classroom teachers there who are not so certified. (Ms. O'Leary Kane)

- The student is receiving accommodations in the general education classroom specifically through the full time assistance of the speech/language pathologist (SLP). Without a full time SLP in the classroom the student could not yet be in a general education classroom and access the curriculum. (Ms. O'Leary Kane)

- There are thirteen students in her current classroom, ten of whom have no disability and are general education students. The student is one of three students who have been designated as a child with a disability and to whom the speech/language pathologist focuses assistance during the classroom instruction. The student's current classroom teacher at River is not certified as a special education teacher. (Ms. Mannle's testimony)

- Assistance is given to the disabled students in the classroom individually and in small groups. The grouping of student often includes students who are non-disabled. At times the hearing impaired students are instructed by and in groups with only the general education teacher providing the instruction. (Ms. Rowenhorst's testimony)

- The student receives individual speech/language therapy approximately 30 minutes per day. She receives an hour of individual therapy outside the classroom. The speech pathologist consults with the audiologist and handles the technology and is specifically responsible for the communication goals and objectives. (Ms. Rowenhorst's testimony)

(In the Matter of SW   DOB: 4/10/90   HOD: June 24, 2005)

### *The Student's Disabilities and Classroom Performance:*

- The student has a profound hearing loss but as result of and with the implant the student has hearing ability categorized as a mild hearing loss. As a result of her hearing loss her language skills are underdeveloped. She can distinguish sounds and can discriminate between words. However, she has difficulty with identifying long sentences because of her language deficiencies. (Dr. Mertes' testimony)[5]

- The student's progress at River has been more rapid than the River staff expected. Her auditory abilities are significantly developed; however, she continues to need significant language development. Her academic performance is above grade level and socially she is interacting well with peers and adults. The student doesn't need as much educational molding; rather, she needs more experience communicating so she can more easily understand what is being presented to her. (Ms. O'Leary Kane's testimony)

- When she arrived at River the student had a limited vocabulary and used very short sentences. Her vocabulary has increased and her sentence structure has improved. She needs support in grasping classroom instructions. She enjoys reading and is doing first grade work in reading comprehension. (Ms. Mannle's testimony)

- The student can hold a conversation with a peer or adult with several turns back and forth which is drastic improvement over her conversational skills when she arrived at River. The rate of speech that most people use is too fast for her. She has a hard time expressively communicating in a manner that is fully understandable. (Ms. Rowenhorst's testimony)[6]

- The "typical developing peers" provide the student a variety of language models. Children are often more motivated to communicate with children rather than adults and the children provide a student motivation to interact and communicate. (Ms. Mannle's testimony)

**ISSUE(S):**

Did DCPS deny the student FAPE by:

1. Failing to timely evaluate the student and develop an IEP following the request for services on May 24, 2004?
2. Failing to provide an appropriate educational placement during summer 2004?
3. Failing to develop an appropriate IEP in September 2004. Specifically the parent asserts (1) that instructional services in the IEP should be delivered by a general

---

[5] Ms. Mertes was designated as an expert in audiology.
[6] Ms. Rowenhorst was designated as an expert in speech/language pathology.

(In the Matter of SW   DOB: 4/10/90   HOD: June 24, 2005)

education teacher and speech pathologist rather than a special education teacher, and (2) the time designated in the IEP that the student is to be in a special education setting should be 100% because the student is in need of a speech/language pathologist 100% of the time.
4. Failing to provide an appropriate educational placement for SY 2004-05? Specifically the parent asserts Key is an inappropriate placement for the student.

## CONTENTIONS OF THE PARTIES:

DCPS counsel asserted the following:

1. As soon as DCPS became aware of the student and her disability it worked with the parent to evaluate the student, develop an IEP and provide an appropriate placement.
2. The IEP and meeting notes reflect that the goals and services were agreed upon.
3. The disagreement is whether the student needs a specialized full time program or what River School has to offer.
4. DCPS has met its burden of proof – it had full discussion during the IEP meeting and a full discussion of placement.
5. DCPS has clearly provided a program that can provide FAPE.
6. The parent has the right enroll the student in the program of his choice.
7. However, DCPS only needs fund a private placement or reimburse the parent when its burden of proof that it provided an appropriate placement has not been met.
8. The parent's advocate gave had no specifics about the Key school, no specifics about the students or the teachers and she cannot speak credibly as to what Key can and cannot provide this student sufficient to rebut the showing of the school's appropriateness.
9. There is disagreement from the many experts advocating their respective methodologies but the placement DCPS proposed was appropriate.
10. The method that DCPS offered met the requirement of FAPE.

The parent's counsel asserted the following:

1. The parent is seeking reimbursement for summer 2004 and the 2004-05 school year.
2. The parent first sought special education services in May 2004 and he was not allowed to proceed with his request until mid July, so at a minimum reimbursement is due from that period.
3. Under IDEA DCPS is required to develop an IEP within 30 days of an eligibility determination which is the measure of what time period is reasonable under the statute.
4. 120 days is far beyond a reasonable time to evaluate the student and provide a placement.
5. The parent has no dispute that the student is in need of a full time special education placement and no dispute as to the goals and objectives in the IEP.

(In the Matter of SW   DOB: 4/10/90   HOD: June 24, 2005)

6. However, parent disagrees with the IEP to as to who should provide the services and the placement proposed by DCPS.
7. DCPS has to demonstrate FAPE in the LRE.
8. The MDT/IEP notes, the speech/language evaluation and Dr. Taylor-Davis' report all indicate the student is in need of an inclusion program not mainstreaming.
9. All the talk about mainstreaming is a red hearing because DCPS has not offered the student mainstreaming.
10. Mr. Schmidt clearly indicated his opinion that the student is not yet ready for mainstreaming.
11. The IEP goals indicate the need for peer modeling with non-disabled peers; at Key the student would be in a classroom with only disabled peers.
12. Key cannot meet the student's individual needs that are reflected in the agreed upon goals and objectives that student develop skills with typically developing peers as she would in the inclusion program at River.
13. The student has 139 IQ and a mechanically assisted normal hearing level - to place her in a self contained classroom is totally inappropriate.
14. Rowley at page 202 states that IDEA requires that DCPS educate students with non-handicapped standards wherever possible.
15. This standard is also supported by the decisions in the 3rd circuit - Olberti 995 F2d 1204, the 5th circuit - Daniels 874 F2d 1036 and the 11th circuit - Greer 950 F2d 688.
16. The student's language gaps are closing rapidly and she is developing by leaps and bounds at River.
17. Because the student has already been in an inclusion setting DCPS needed to show that this setting was not appropriate.
18. Key is a more restrictive than the student's current educational placement; she has demonstrated she can be educated and is benefiting educationally from a less restrictive environment.
19. Placement at Key is clear violation of the LRE requirements of 34 CFR 300.550,552.[7]

## CONCLUSIONS OF LAW:

Pursuant to 5 DCMR 3022.16 DCPS bears the burden of proof, based solely upon the evidence and testimony presented at the hearing, that the action or proposed placement is adequate to meet the educational needs of the student.

---

[7] 34 CFR § 300.550 provides:

DCPS shall ensure —
(1) That to the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are non-disabled; and
(2) That special classes, separate schooling or other removal of children with disabilities from the regular educational environment occurs only if the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

(In the Matter of SW  DOB: 4/10/90  HOD: June 24, 2005)

1. Did DCPS deny the student FAPE by failing to timely evaluate the student and develop an IEP following the request for services on May 24, 2004? DCPS sustained its burden of proof.

Pursuant to DC Code sec. 38-2501[8] DCPS has 120 days following a request or referral for special education services to evaluate a student and provide a special education placement if the student is found eligible. Although parent's counsel asserts that this period is unreasonable the Hearing Officer is unconvinced by this argument. The 120 day period has been considered and decided upon by the legislature. There was no evidence presented that this period is unreasonable.

Although IDEA requires services be provided within 30 days of an eligibility determination, there is no mandate in the statute that yet contradicts a state's prerogative to set what it considers to be a reasonable period to evaluate a student and provide services. The District of Columbia has set its standard and unless it is shown to be unreasonable through some specific factors other than a simple comparison of a different provision of the statute, the District's current standard should be followed.

The parent requested services for the student on May 24, 2005. DCPS had until September 24, 2005, to evaluate the student and provide services. DCPS conducted its evaluation and review of existing evaluations, convened an MDT meeting, found the student eligible, developed an IEP and offered the parent a placement for the student by September 15, 2005. DCPS met the required time frame. Although the parent rejected the proposed placement and asserted it is was inappropriate DCPS offered the student what it considered to be FAPE within a reasonable time.

2. Did DCPS deny the student FAPE by failing to provide an appropriate educational placement during summer 2004? DCPS sustained its burden of proof.

The parent enrolled the student in River in April 2004 and she completed its school year in July 2004. The parent asserts that DCPS should have provided the student a placement during the summer of 2005. As indicated in the reasoning expressed above, DCPS was obligated to provide a placement to the student by September 24, 2005. It provided that placement by September 15, 2005, within weeks of the student beginning the new school year at River. There was no harm to the student and no denial of FAPE.

---

[8] DC Code § 38-2501. Assessment and placement of special education students [Formerly § 31-1861]
  (a) The District of Columbia Board of Education ("Board"), or its successor, and the District of Columbia Public Schools ("DCPS") shall assess or evaluate a student, who may have a disability and who may require special education services, within 120 days from the date that the student was referred for an evaluation or assessment.
  (b) If a student is classified as having a disability, as defined in section 101(a)(1) of the Individuals with Disabilities Education Act, approved April 13, 1970 (84 Stat. 175; 20 U.S.C.S. § 1401(a)(1)), or in section 7(8) of the Rehabilitation Act of 1973, approved September 26, 1973 (87 Stat. 359; 29 U.S.C.S. § 706(8)), the Board and DCPS shall place that student in an appropriate program of special education services.

(In the Matter of SW  DOB: 4/10/90  HOD: June 24, 2005)

3. Did DCPS deny the student FAPE by failing to develop an appropriate IEP in September 2004? Specifically the parent asserts (1) that instructional services in the IEP should be delivered by a general education teacher and a speech pathologist rather than a special education teacher, and (2) the time designated in the IEP that the student is to be in a special education setting should be 100% because the student is in need of a speech/language pathologist 100% of the time. Conclusion: DCPS sustained its burden of proof.

Although the student clearly has a hearing impairment, DCPS first considered that the student was not eligible for special education services, presumably because of her high IQ and above average academic performance. The Hearing Officer, too, considered this possibility in light of the parent's assertion that the student needs the services of a full time speech language pathologist and not a special education teacher.

34 CFR 300.7 defines a child with a disability as a "child evaluated…as having …a hearing impairment including deafness, a speech or language impairment…who, by reason thereof, needs special education and related services."

However, 34 CFR 300.7(a)(2)(i) provides that if it is determined… that a child has one of the disabilities identified …, but only needs a related service and not special education, the child is <u>not</u> a child with a disability…"[9]

The parent and DCPS have, nonetheless, agreed that because the student's hearing impairment and speech/language impairment she is a "child with a disability" and in need of special education. Despite the parent's assertion the student is in need of a speech/language pathologist 100% of the time, the parent has <u>not</u> asserted the student's need for special education is limited to speech/language services. The parent and DCPS agreed the student in need of specialized instruction and agreed on the student's communication and academic goals and objectives.

The parent asserts, however, the specialized instruction should be provided by a speech language pathologist (SLP). Or more precisely, the parent asserts the student requires the use of paired full time professionals to provide specialized instruction: a general education teacher and a SLP. The testimony from the parent's witnesses was clear: the student cannot access and benefit from the general education setting without the support of a full time speech language pathologist in the classroom.

It clear from this argument the parent is asserting the services prescribed in the IEP should match the manner and form in which the services are provided at the educational

---

[9] On the other hand, 34 CFR 300.7(a)(2) (ii) provides "If the related service required by the child is considered special education rather that a related services under State standards, the child would be a child with a disability." 5 DCMR 3001.1 defines special education as specially designed instruction , at no cost to the parent, to meet the unique needs of the child with a disability, including the instruction conducted tin the classroom, …"Special education, if it meets this definition includes speech-language pathology services…" Thus, presumably under DCPS standards the delivery of speech language services alone could qualify a student as eligible.

(In the Matter of SW   DOB: 4/10/90   HOD: June 24, 2005)

placement proposed by the parent. However, with regard to that placement the SLP cannot provide the academic instruction the student needs as she is not a certified teacher and the student's teacher is not certified in special education. Presumably neither provider can alone legitimately provide specialized instruction to the student.

In providing FAPE DCPS requires that specialized instruction be provided by a certified special education teacher as DCPS proposed in the student's IEP.[10] The testimony indicates that in drafting the IEP DCPS contemplated that the special education teacher(s) delivering the instruction would be certified teacher(s) of the deaf and hard of hearing.

Ms. Robert's and Mr. Schmidt's testified the special education teacher is trained in auditory language skills and can monitor and develop the student's listening skills and speech as a critical part of instruction throughout the school day. The special education teacher in this instance has been specifically trained to not only provide academic instruction but to provide the instruction coupled with the speech/language and communication skill development that are outlined in the IEP's goals and objectives. The special education teacher can provide the special education alone without the assistance of a full time SLP. There was sufficient evidence that the DCPS' proposal to use a qualified special education teacher to deliver specialized instruction is appropriate and there was no denial of FAPE in this regard.

The parent also asserted the IEP was inappropriate because the time designated in the IEP that the student is to be in a special education setting was less than 100% because the student is in need of a speech/language pathologist 100% of the time. The student is clearly in need of individual and group speech/language therapy. However, based upon the reasoning above the student is obviously not in need of a speech pathologist 100% of the time; a special education teacher can implement of the IEP goal and objectives providing specialized instruction without a full time SLP.

A 100% special education setting typically describes a setting in which a student is in a self contained special education school and with disabled peers the entire school day. On one hand the parent asserts the student should be in an inclusion program with non-

---

[10] 34 CFR 300.13 provides: "the term free appropriate public education or FAPE means special education and related services that ...(b) Meet the standards of the SEA... and (d) Are provided in conformity with an individualized education program (IEP) that meets the requirements of §§ 300.340 – 300.350." IDEA generally requires that special education services be provided by qualified personnel. 34 CFR 300.23 indicates qualified personnel means personnel "who have met SEA-approved or SEA-recognized certifications, licensing, registration, or other comparable requirements that apply to the area in which the individuals are providing special education or related service." DCPS as the SEA has prescribed requirements for a special education teacher in the area of hearing impaired described in 5 DCMR 1648.1: "In addition to the general and professional education requirements, for certification in special education (categorical), coursework in the common core (twenty-one (21) semester hours), and coursework in one of the following areas shall be required:...(b) Hearing impairments (fifteen (15) semester hours): (1) Characteristics of individuals with hearing and related speech disorders; (2) Speech science and audiology; (3) Instructional procedures for the education of the hearing-impaired, including manual communication; and (4) Individual and group amplification systems with emphasis upon classroom utilization;...".

(In the Matter of SW  DOB: 4/10/90  HOD: June 24, 2005)

disabled peers, but on the other hand asserts she should be programmed for special education 100% of the time. The Hearing Officer in unconvinced by this argument.

The student's IEP prescribes a total of 27.5 hours of programming consisting of 21.5 hours of specialized instruction, 5 hours of speech services, and 1 hour audiological services. The Hearing Officer takes administrative notice that the maximum number of hours in a school week within DCPS is 32.5 hours.

Thus, the IEP implies that for 1 hour per day the student is not programmed to have special education services. This "non-programmed time" is presumably when the student would have lunch and/or recess with non-disabled peers. There is no evidence that the student cannot function or would be harmed by being in a setting with non-disabled peers for such a short period without the presence of a special education teacher or related service provider. Nonetheless, there was testimony that the special education teachers at the placement setting proposed by DCPS have lunch room and recess duty and are most often available during those periods to assist the special education students with peer communication if needed. The Hearing Officer concludes that the student is not in need of a 100% special education setting with a speech language pathologist 100% of the time and that the student's IEP is appropriate.

4. Did DCPS deny the student FAPE by failing to provide an appropriate educational placement for SY 2004-05? Specifically, the parent asserts Key is an inappropriate placement for the student. Conclusion: DCPS sustained its burden of proof.

Having determined that the student's IEP is appropriate the fundamental question in whether a placement is appropriate is whether the student's IEP can be implemented.[11] The student's IEP prescribes a total of 27.5 hours of programming consisting of 21.5 hours of specialized instruction, 5 hours of speech services, and 1 hour audiological services. The evidence indicates that all components of the IEP can be provided at Key. The specialized instruction can be provided by the special education teacher, and the placement has a qualified audiologist and speech/language pathologist to provide the student's related services.

The IEP's goals and objectives indicated that the student progress be measured with typically developing peers. Although the IEP DCPS proposed did not include, at the outset of the placement, hours in which the student would be mainstreamed with non-disabled peers there was testimony that some of the five hours of speech language services could be provided to the student in a classroom setting and perhaps with non-disabled peers in special such areas. In addition, even though the student has high academic abilities the teacher at Key indicated the special education students have

---

[11] 34 CFR § 300.346 provides in pertinent part:

In developing each child's IEP...The IEP team also shall –
... (iv) Consider the communication needs of the child, and in the case of a child who is deaf or hard of hearing, consider the child's language and communication needs, opportunities for direct communications with peers and professional personnel in the child's language and communication mode, academic level, and full range of needs, including opportunities for direct instruction in the child's language and communication mode.

(In the Matter of SW    DOB: 4/10/90    HOD: June 24, 2005)

varying levels of academic abilities and the teacher can provide challenging academic development for the student.

IDEA requires that in providing special education children with disabilities be educated in the least restrictive environment (LRE) and, to the extent appropriate, with children who are non-disabled. However, meeting the LRE requirement does not require that a disabled child be educated in the same classroom with non-disabled children in all circumstances. The placement must be appropriate.

The parent asserts that the student's placement at River is the least restrictive environment because the student is receiving full time education with non-disabled peers. However, the testimony was clear the student could not access and benefit from the general education setting without the support of a full time speech/language pathologist in the classroom. The Hearing Officer concludes based on the evidence that the student's current speech/language skills do not allow her to be in a general education setting. A general education setting with a full time speech pathologist is not a general education setting – it amounts to a full time special education setting – full time speech pathology services in order to access the academic curriculum.[12]

DCPS is bound by D.C. Code § 38-2501 to first place a student at a public school if the public placement is appropriate.[13]

In Schoenbach v. D.C., 309 F.Supp. 2d 71 (D.D.C. 2004) the District Court held: "...if a public school placement is appropriate, a school district need not consider a private placement, 'even though a private school might be more appropriate or better able to serve the child.' Jenkins v. Squillacote, 935 F. 2d 303, 305 (D.C. Cir. 1991). The analysis of the appropriateness of a public school placement 'is not comparative.' Id."

Fundamentally, the underlying issue in this case is a dispute over the methodology to be used in implementing the student's IEP. Specifically, whether the student should be in a setting with non-disabled peers with use of a full time SLP or, as DCPS has proposed, in a self contained setting until her communication skills are sufficient for her to be in a general education setting with less than full time support.

---

[12] In essence, the parent asserts the student should receive speech language services on a full time basis comparable to the student having a dedicated aide; in this case, a dedicated service provider. Following this logic, if the student actually needs the services of a full time SLP in a general education classroom the student could presumably access the general education curriculum at her home school with the support of a full time SLP.

[13] (c) Special education placements shall be made in the following order of priority provided that the placement is appropriate for the student:
   (1) DCPS schools or District of Columbia public charter schools;
   (2) Private or residential District of Columbia facilities; and
   (3) Facilities outside of the District of Columbia.

(In the Matter of SW  DOB: 4/10/90  HOD: June 24, 2005)

Placement sometimes involves choosing between competing educational philosophies or methodologies. It is generally held that the selection of educational philosophies rests with the educational institution. "[O]nce a court determines the requirements of [Individuals with Disabilities Education] Act have been met, questions of [educational] methodology are for resolution by the States.'" The mainstreaming requirement does not give parents the right "to compel a school district to provide a specific program or employ specific methodology in providing for the education of their disabled child." Schools have the power to provide disabled children with an education they consider more appropriate than that proposed by the parents.[14]

The parent's counsel presented witnesses some of whom were qualified as experts to support a finding that the student's current placement and the methodology used there is the most appropriate for the student's needs. These experts have experience with this student; they also are part of the River staff and apparently support its methodology. However, there was scant evidence that the student would be determinately impacted by being at the placement proposed by DCPS.[15] The crux of their testimony was that the methodology used at River was better for this student. The parent understandably wants what he believes to be the best for his child. However, the LEA is not required to provide the best but to provide FAPE.

34 CFR 300.300 provides that services and placement must be based on the unique needs of the student not based on the student's disabilit[ies]. The River method may be an effective means for meeting the unique needs of this student, but it is not the only appropriate means of meeting those needs. DCPS put forth credible and sufficient testimony that it uses a viable method of educating students with HI and SLI combined disabilities to quickly transition them according to their abilities to full time mainstreaming[16] and that the method, program and placement proposed can meet the unique needs of this student. The Hearing Officer concludes that in proposing the student's placement at Key DCPS offered the student a FAPE.

---

[14] Lachman v. Illinois State Board of Education 852 F2d 290 (1988) and 4-10 EDUCATION LAW § 10.03 citing Board of Educ. v. Rowley, 451 U.S. 176, 208, 102 S. Ct. 3034, 73 L. Ed. 2d 690, 5 Educ. L. R. 34 (1983) and Barnett v. Fairfax County Sch. Bd., 721 F. Supp. 757, 56 Educ. L. R. 802 (E.D. Va. 1989), aff'd, 927 F.2d 146, 66 Educ. L. R. 64 (4th Cir.) and Hudson ex rel. Tyree v. Wilson, 828 F.2d 1059, 1178, 1182, 421 Educ. L. R. 830 (4th Cir. 1987).

[15] Courts have concluded generally that when considering a change in educational methodologies for disabled student's careful attention should be paid to the possible detrimental effects of making a premature change. Although the student has developed rapidly while at River the appropriateness of Key as a placement has to be judged as of when it was offered in September 2004. The methodology was new to the student so presumably a change in methodology was not a critical at that juncture.

[16] Although the parent's advocate did not see extra support given to the disabled student she observed in a general education classroom the Hearing Officer credits Ms. Robert's testimony that the support is provided to student's who are mainstreamed at Key.

(In the Matter of SW  DOB: 4/10/90  HOD: June 24, 2005)

## ORDER:

DCPS shall not be required to reimburse the parent for the student tuition at the River School for the summer 2004 or the 2004-05 school year.

## APPEAL PROCESS:

This is the final administrative decision in this matter. Appeals on legal grounds may be made to a court of competent jurisdiction within 30 days of the rendering of this decision.

_____
Coles B. Ruff, Esq.
Hearing Officer
Date: June 24, 2005

Issued: _____