## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THE DISTRICT OF COLUMBIA          :
                                  :
                                  :        Civil Action No. 05-1309
            Plaintiff,            :        (RJL)
                                  :
v.                                :
                                  :
JEPPSEN                           :
                                  :
            Defendant             :
                                  :
_____   :

## DEFENDANT'S ANSWER TO PLAINTIFF'S MOTION
## FOR SUMMARY JUDGMENT

Comes now defendant, by and through counsel, pursuant to FRCP 56, and moves this honorable Court to deny plaintiff's Motion for Summary Judgment in its favor. As grounds for this answer, and as more fully discussed in the accompanying Memorandum, defendant submits that the Hearing Officer did not err when he found that the District of Columbia Public Schools ("DCPS") failed to meet its burden of proof in demonstrating that its proposed placement at Key Elementary school was an appropriate placement for the student.

Respectfully submitted,

_____/s/_____
ELLEN DOUGLASS DALTON, Esq.
Counsel for the Defendant
Bar #411612
Bar #411612
Dalton, Dalton, & Houston P.C.
1008 Pendleton Street

Alexandria, Virginia 22314
(703) 739-4300
(703) 739-2323

December 14, 2005

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| THE DISTRICT OF COLUMBIA | : | |
| | : | |
| | : | Civil Action No. 05-1309 |
| Plaintiff, | : | (RJL) |
| | : | |
| v. | : | |
| | : | |
| JEPPSEN | : | |
| | : | |
| Defendant | : | |
| | : | |
| _____ | : | |

**MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT**

Preliminary Statement

On March 28, 2005, pursuant to the Individuals with Disabilities Education Act, 20 U.S.C. 1400 *et. seq.*, a Hearing Officer ("HO") issued a Determination ordering the District of Columbia Public Schools, hereinafter referred to as "DCPS" to continue to place and fund the student at the River School for the 2004-2005 school year.  (R. at 14). This decision was based on the finding that DCPS had not sustained its burden of proof in demonstrating that its proposed placement at Key Elementary School was appropriate. (R. at 2).

The student is a seven year old child diagnosed with a speech & language impairment (SLI); hearing impairment (HI); and other health impairment (OHI) for ADHD.  (R. at 3).  She was born prematurely at 25 weeks and is a twin.  She has been

attending the River School since 2000.  (R. at 2).  In 2001, she received a cochlear

implant at Johns Hopkins Hospital.  She has continued to receive her educational services

at the River School, where she received all of her academic instruction in an inclusion

based, general education classroom of thirteen (13) students.  Ten (10) of the thirteen

(13) students are typically developing students with no disabilities and three (3) have

varying degrees of hearing loss.  The student received the support of a full time speech &

language therapist in the classroom that allows her to remain in a general education

setting all day except for 1 hour of pull out for speech & language and 1 hour of pull out

for audiology services.  (R. at 288)

In June 2004, DCPS contacted the River School and requested a reconvening of

the student's annual IEP meeting.  The parent agreed and the IEP meeting was convened

on June 21, 2004.  After more than two hours has elapsed, the team agreed to reconvene

as it was apparent that the IEP could not be completed that day.  All members agreed

orally as to the new date and time of July 2, 2004.  On July 2, 2004 the team members

from the River School as well as the Parent convened to finish the IEP and discuss

placement.  However, the LEA representative from DCPS did not show up.  The River

School sent an email to Mr. Thomas, placement specialist for DCPS, on July 2, 2004.

Mr. Thomas did not respond until July 21, 2004.  On July 21, 2004, he sent an email

proposing three proposed dates, July 28th, 29th, and 30th.  However, the River School

responded that July 23rd was the last day of school and consequently neither the student's

teacher nor other providers would be available until the school reopened in early

September.

Subsequently, when school reopened in September and school personnel were

available, the student's mother contacted Mr. Thomas.  He advised her at that time that

he no longer was handling the matter, that it had been turned over to Pamela Owens.  The

student's mother attempted to contact Ms. Owens in order to schedule a date to complete

the IEP, but received her voicemail and left a message.  Ms. Owens did not return her

call, but instead contacted the River School and advised them that a Notice of Placement

had been issued for the student to attend the Key School.  This Notice of Placement was

dated August 26, 2004.

A Request for Due Process Hearing was filed contending that DCPS violated the

parent's rights by unilaterally making a placement decision without convening a meeting

to finish the development of the IEP and discuss placement in accordance with 34 C.F.R.

§ 300-501(c); 34 C.F.R. § 300-345; 34 C.F.R. § 300-552.  Thereafter, the parties entered

into a Settlement Agreement which required DCPS to convene an IEP meeting on or

before November 30, 2004.  The team was required to review all evaluations, review and

revise the IEP if necessary, discuss and determine placement and issue a Notice of

Placement, if public within 5 days and if private within 30 days.

An IEP meeting was held on November 17, 2004.  Initially, DCPS told the parent

that the IEP meeting would be held at the Key School.  Counsel for the parent initially

contacted Ms. Dishman-Owens, the LEA representative to require that the meeting be

held at the student's current educational placement so that her teachers and other

providers knowledgeable about the student could participate.  When no response was

received, counsel for the parent contacted the DCPS counsel and inquired as to why the

meeting was being held at a place other than her current educational placement.  DCPS

thereafter agreed to convene the meeting at the River School.

The participants at the meeting included the parent, her counsel, members of the River School including the student's classroom teacher and service providers, and DCPS personnel including staff members of Key Elementary school.  (R. at 2).  In addition to the LEA representative, Ms. Dishman-Owens, Paula Perelman, an attorney with DCPS in the Strategic Planning and Policy Division attended the meeting.

At this meeting, the participants reviewed the student's most recent speech & language evaluation prepared by the speech & language pathologist who provides the student services at the River School.  All of the members agreed that the student had multiple disabilities including SLI, HI and OHI.  (R. at 3).  All of the members also agreed to the number of hours of specialized instruction, the related services and the goals and objectives for the IEP.  (R. at 3).  There was disagreement, however, as to whether the student's primary disability classification was SLI or HI.  (R. at 3).  There was also disagreement as to whether the student's specialized instruction should be delivered in a general education inclusion setting as was being done at the River School or whether the services should be delivered in a full time special education setting designed for mainstreaming as at Key Elementary, the DCPS proposed placement.  (R. at 3).

As a result of these disagreements, two IEPs were developed.  (R. at 3).  One IEP was developed by 6 DCPS personnel, 3 of which had never even observed the student. The other IEP was developed by the student's teacher, speech & language pathologist, audiologist, and Director of the speech & language services at the River School.

The parent was in agreement with the IEP that was developed by the River School.  Following the IEP meeting, DCPS announced that they were proposing the Key

School for the student's placement.  None of the professionals at the River School who

are currently working with the student agreed with a more restrictive placement in an Out

of General Education Placement at Key School.  The Parent did not agree with the DCPS

proposed placement and requested that her daughter remain at the River School where

she would continue to remain in an inclusive General Education setting 98% of her time

with the support and accommodations as described in her IEP, including but not limited

to a full time Speech & Language Pathologist in the classroom.  DCPS proceeded to issue

a Notice of Placement for an Out of General Education setting at the Key School.

As a result of this Notice of Placement, a Request for Due Process Hearing was

filed on November 23, 2004.  (R. at 130).  Upon completion of this hearing, the HO, in a

decision dated March 28, 2005, concluded that DCPS had sustained its burden of proof

that the IEP was developed to meet the **unique needs** of the student, and that it had

presented sufficient evidence that the placement decision was made with participation of

the parent, but it had not sustained its burden of proof in demonstrating that the proposed

change of placement was appropriate.  (R. at 12).

## ARGUMENT

### I.    The Standards of Review Applicable in this Case

#### A.    Summary Judgment

A judgment in favor of a motion for summary judgment shall be rendered only in

cases where "the pleadings, depositions, answers to interrogatories, and admissions on

file, together with the affidavits, if any, show that there is no genuine issue as to any

material fact and that the moving party is entitled to a judgment as a matter of law."

Fed.R.Civ.P. 56 (2005).  The substantive law identifies which facts are material, as

"[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Furthermore, the question of whether the dispute about a material fact is "genuine" is answered by determining if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Finally, in determining whether there exists a genuine issue of material fact, "the court must regard the non-movant's statements as true and accept all evidence and make all inferences in the non-movant's favor." *District of Columbia v. Ramirez*, 377 F. Supp. 2d 63, 67 (D.D.C. 2005) (citing *Anderson*, 477 U.S. at 255).

## B.    Review of Administrative Decisions Under IDEA

According to IDEA, "any party aggrieved by the findings and decision" rendered during administrative proceedings is permitted to "bring a civil action" in state or federal court without regard to the amount in controversy. *Id.* (citing 20 U.S.C. § 1415(i)(2) (2005); 34 C.F.R. § 300.512(b)(3) (2005)). The statute and accompanying regulations mandate that the reviewing court receive the records of the administrative proceedings, hear additional evidence at the request of either party, and grant such relief as the court determines is appropriate, based on the preponderance of the evidence standard. 20 U.S.C. § 1415(i)(2)(B)(iii) (2005); 34 C.F.R. § 300.512(b)(3) (2005). In reviewing a Hearing Officer Determination (HOD), the burden of proving such evidence, by a preponderance of the evidence, is always on the party challenging the administrative determination. *Ramirez*, 377 F. Supp. 2d at 67 (citing *Kerkam v. McKenzie*, 862 F.2d 884, 887 (D.C. Cir. 1988).

It is judicially established that the provision calling for the reviewing court to

base its decision on the preponderance of the evidence is "by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Board of Education v. Rowley*, 458 U.S. 176 (1982); *Spiegler v. District of Columbia*, 866 F.2d 461, 466 (D.C. Cir. 1989); *Dreher v. Amphitheater Unified School District*, 797 F. Supp. 753, 757 (D. Az. 1992) (explaining that the courts lack specialized knowledge and experience in educational policy, and so it is not the role of the courts to overturn State decisions, as long as those decisions are in accordance with § 1415). The Court read the requirement under § 1415(e) that the reviewing court "receive the records of the [state] administrative proceedings" to imply a further requirement that due weight be given to the administrative proceedings. *Id*. This "due weight" standard of review "does not rise to the level of de novo review because courts must be careful to avoid imposing their view of preferable educational methods upon the states." *Schoenbach v. District of Columbia*, 309 F. Supp. 2d 71, 77 (D.D.C. 2004). Other courts have clarified the "due weight" requirement, referring to it as a "modified de novo review." *MM v. School District of Greenville County*, 303 F.3d 523, 530-31 (4th Cir. 2002); *Susan N. v. Wilson School District*, 70 F.3d 751, 758 (3d Cir. 1995) (citing *Murray v. Montrose County School District*, 51 F.3d 921, 927 (10th Cir. 1995). The amount of weight that must be afforded to administrative findings depends on whether the issue necessitates educational experience. *McLaughlin v. Holt Public Schools Board*, 320 F.3d 663, 669 (6th Cir. 2003). Administrative findings on matters in which educational expertise is relevant should be given more weight. *Id*. Furthermore, factual findings from the administrative proceedings are to be considered prima facie correct. *MM*, 303 F.3d at 531.

**II.    The Hearing Officer was Correct in Concluding that DCPS had not Sustained its Burden of Proof that Key Elementary School was an Appropriate Placement for the Student**

At hearing, according to 5 DCMR 3022.16, DCPS had the burden of proof to establish that the proposed placement of Key Elementary School was adequate to meet the individual needs of the student.  The HO found that DCPS had not sustained this burden.  Defendant claims that the HO based his decision on the fact that plaintiff presented more experts than defendant to support a finding on the appropriateness of placement and methodology.  (M. at 8).  This is not true.  The HO relied primarily on the fact that "DCPS did not conduct i[t]s own evaluations of the student or present testimony that sufficiently refuted the experts who had significant experience with the student."  (R. at 13).  Furthermore, the one expert that DCPS did present had not observed the student, but rather only reviewed her SL report.  The HO concluded that, "DCPS may very well have prevailed on this issue had it presented evaluators, witnesses and/or experts who had experience with this student and an ability to more aptly speak to the individual needs of this student."  (R. at 13).

According to these statements, the decision of the HO was not grounded in the number of witnesses presented by each side.  Rather, the decision was supported by the quality of the evidence presented.  The HO noted that, "DCPS presented significant testimony on its program and methodology for HI/SLI students, but far less on this particular student."  (R. at 13).  Therefore, DCPS failed to meet its burden of demonstrating that placement at Key Elementary School could meet the unique needs of the student.

IDEA requires that school districts provide each disabled student with a free

appropriate public education ("FAPE"), which "emphasizes special education and related services designed to meet their unique needs and prepare them for employment and independent living." *20 U.S.C. § 1400(d)(1)(A).* While the school is not required to provide the best possible education for each student, it must provide for some educational benefit. This "basic floor of opportunity provided by the Act consists of access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child." *Rowley*, 458 U.S. at 201.

The Court, in *Rowley*, announced a two-step test for determining whether a placement violates IDEA. First, the Court must decide whether the school officials complied with the procedures set forth in IDEA, and then turn to whether the IEP developed through IDEA procedures was reasonably calculated to enable the child to receive educational benefits. *Rowley*, 458 U.S. at 206. In this case, while the HO found that DCPS did comply with the IDEA procedures, the school system did not prove that its proposed placement is appropriate. (R. at 12).

The HO correctly found that the placement proposed by DCPS did not satisfy IDEA section 612(5), because it did not situate the student in the least restrictive environment ("LRE"). (R. at 12-14). According to the Act, the student should "be educated with children who are not handicapped…the maximum extent appropriate." 20 U.S.C. § 1412(5)(B). n5. This means that the student should only be taken out of the regular education classroom when "the nature or severity of [the student's] handicap is such that education in the regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." *Id.*

The student should be placed in the least restrictive environment to the extent that

is appropriate.  Plaintiff cites several cases that hold that the LRE is inapplicable where education in the regular education environment cannot be achieved satisfactorily.  (M. at 10).  This argument is misplaced, as even the plaintiff acknowledges that "a child should be removed from the regular classroom environment and placed in a special class only to the extent that 'the nature or severity of [the student's] handicap is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.'"  (M. at 10) (citing 20 U.S.C. § 1412(5)(B)n5).  The record here clearly shows that the student has made satisfactory progress in the River School, where she is educated in the same class as regular education students.  (R. at 4).  This progress proves that the student can be successfully educated in an inclusion class, which makes placement at the River School, not only the least restrictive environment, but also an appropriate placement for this student.  Placement at the Key School would result in the student being placed in a 98% of the time out of General Education class.  (R. at 3).  This placement would act as a step backward, placing the student in a more restrictive environment, and therefore violates the LRE requirement of the Act.

In consideration of which type of environment meets the LRE requirement, the IEP team must, as plaintiff asserts, select the methodology or methodologies that will be employed in its education plan.  (M. at 11).  The courts have held that the Act allocates the responsibility for choosing the educational method most suitable to meet the child's needs to the state and local educational agencies in cooperation with the parents or guardians. *Rowley*, 458 U.S. at 207.  In the present case, there was a fundamental disagreement regarding educational method between the local education agency, in conjunction with the parents, and the state educational agency.  As a result, the HO was

forced to weigh evidence and issue a judgment as to the appropriate program for the

student.  In performing this inquiry, the HO found that counsel for the student presented

ample evidence that the River School program was appropriate, but DCPS failed to do

the same with respect to the Key School.  (R. at 13-14).

Two DCPS witnesses opined that Key would actually be a less restrictive

environment than the River School because, at River School, she was learning in a

different manner than the rest of the students in the classroom.  (T. at 98-99).  This

reasoning, however, is counterintuitive.  The LRE requirement is meant to promote

placing special education students in the same classrooms as regular education students.

Congress has made this intention clear in its legislation and reports.  The Preamble to the

1997 IDEA, for example, states, "[o]ver 20 years of research and experience has

demonstrated that the education of children with disabilities can be made more effective

by…providing appropriate special education and related services and aids and supports in

the regular classroom to such children…."  Another congressional report explains that

the LRE requirement is meant to ensure that, "to the maximum extent appropriate,

children with disabilities are educated with children who are nondisabled and that special

separate schooling, or other removal of children with disabilities from the regular

educational environment, occurs only when the nature or severity of the disability is such

that education in regular classes with the use of supplementary aids and services cannot

be achieved satisfactorily.  *S. Rep. No.* 105-17, p. 11; *H. R. Rep. No.* 105-95, p. 91

(1997)).

What is important, therefore, is not the manner in which the student is learning,

but rather the environment in which the student is learning.  Logically, students with

special education needs are going to require different services than do regular education students. This is why the courts have interpreted the Act to mandate that efforts to provide FAPE are "supported by such services as are necessary to permit the child to benefit from the instruction." *Rowley*, 458 U.S. at 188. Ms. Roberts herself even testified that once a student is mainstreamed into the regular education classroom at Key, the special education teacher continues to provide support to the student. (T. at 87). Simply because the student requires support services in the inclusion setting does not mean that it is a restrictive environment.

At hearing, DCPS presented an abundance of evidence regarding the hearing impaired ("HI") program that is housed at the Key School. The school district talked a lot about the program generally, but failed to adequately address how the school could meet the unique needs of the student. (H.O.D. at 13). The plaintiff maintains this position in its motion, discussing at great length the program at Key, but overlooking whether such a program is appropriate to meet the unique needs of the student.

At the time the IEP was developed, only one expert and two attendants total from DCPS had actually observed the student. (R. at 13). Ms. Pamela Owens, who was monitoring the River School, testified that she observed all of the children for approximately 5-10 minutes. (T. at 57). She contended that the student's primary disability is HI, basing this opinion on her brief observation of the student and a review of her speech and language evaluation. (T. at 57-58). With this limited knowledge of the student, Ms. Owens, who holds a degree in neither speech and language nor audiology, concluded that Key could meet the student's needs. (T. at 46-47, 54, 56-57). Ms. Owens tried to compensate for her insufficient knowledge by bringing with her to the meeting,

other people who specialized in these areas, so that they could review the student's reports and listen to what her teachers had to say.  (T. at 56-57).  None of these people had personally observed or tested the student.  (T. at 57).

Plaintiff relies heavily on the testimony of Ms. Amy Roberts, a DCPS teacher at Key.  While Ms. Roberts is quite knowledgeable about communication disorders, holding a master's degree in such, her first-hand experience with this particular student is extremely limited, having only observed her for about one hour.  (T. at 109).  Her testimony focused mainly on her opinions about the HI program, in general, at Key, which were based on her experience with other students with cochlear implants.  (T. at 111-113).  This is reflected in Ms. Roberts' statement, "children with a cochlear implant should progress quickly if they have the right follow up, including audiological follow-up, educational follow-up."  (T. at 97).  Ms. Roberts also testified that the student's test scores were below the scores of students her age.  The tests she reviewed, however, only evaluated speech and language skills, and was not academic testing.  (T. at 90-91).

The testimony of Mr. Schmidt is also cited at great length by the Plaintiff.  Again, while no doubt a qualified individual in the area of speech pathology and audiology, Mr. Schmidt has a complete lack of personal experience with the student.  In fact, Mr. Schmidt has never even observed the student, but rather based his testimony entirely on his review of the IEP and the speech pathologist's report.  (T. at 130).  Mr. Schmidt pronounced sweeping statements regarding the training of, and methodologies used by, teachers who teach children with a hearing impairment, as opposed to speech therapists. (T. at 137).  Once again, plaintiff's witness chose to focus on generalizations, instead of illustrating how this student in particular would benefit from the suggested program.

Under similar circumstances, other courts have taken into consideration the ability of witnesses to draw conclusions based on personal knowledge of and interaction with the student. *Seattle School District, No. 1 v. B.S.*, 82 F.3d 1493, 1501 (9th Cir. 1994) (minimizing the weight accorded to a witness who "had no personal contact with [the student], was less knowledgable about her condition, and testified in terms of broad generalities").

Like Ms. Roberts, Mr. Schmidt also based his opinions on his experiences with other children, rather than observing this student. In fact, Mr. Schmidt's testimony was based on guesses, rather than knowledge, making statements like, "I think that she is going to face a lot of frustration where she is at currently because of the academic level and because of the language level that she has currently" (T. at 140) and "If she is not facing frustration now, she will be. It has got to be very difficult for her to keep up with the regular first grade curriculum." (T. at 154). These statements demonstrate that Mr. Schmidt based his testimony on what he assumed to be true, unlike the witnesses for the parents, who based their testimony on personal experiences with the child and familiarity with her unique needs.

Mr. Schmidt also stated that the student is not progressing at the appropriate rate because, "students with cochlear implants usually experience one year's growth for one year of school." (T. at 131-132). This echoes a recurring claim by the plaintiff that the student has failed to make progress at the River School, but this claim is false. Mary O'Leary Kane, Director of Speech and Language Services at River, who has been able to personally observe the student, testified that the student has made adequate progress at River. She stated at hearing, "we have seen her go through an amazing number of

milestones within a group of typically developing general ed students." (T. at 206).  Ms.

Rama Murphy, the student's classroom teacher added that the student, "is functioning

appropriately in the general ed classroom," and, "she is making significant gains and

learning appropriately in the classroom." (T. at 291).  Elaborating on the specific gains

made by the student, Ms. Murphy stated that she had seen "a lot of progress…in

language, in academic skills, and in a precursor of study skills." (T. at 291).

Furthermore, in the areas of letter recognition, word recognition, letter sound correlation

and blending sounds together to form letters, Ms. Murphy noted that the student was

"learning at age level with the kids in the classroom." (T. at 292).  As further evidence

that River provides an environment in which the student thrives, Diane Hoffauer, a

speech/language pathologist familiar with the student, testified, "[s]he has learned quite a

bit from being around her typical peers and having that ongoing social interaction has

allowed her to grow in her language and understand a lot more and be able to

communicate a lot more with her peers." (T. at 276).

      The plaintiff contends that the Notice of Placement issued was based in part on

the recommendations from the whole team, including the members from River.  (Tr. at

63).  While it is true that the whole team concluded that the student needed 25.5 hours of

specialized instruction, DCPS misconstrued this fact to mean that the student had to be

out of a general education setting in order to receive this instruction.  (T. at 24, 64).

Inclusion special education, however, is a form of special education provided in a general

education setting, and the members from the River School recommended that the

specialized instruction be provided in this general education setting.  (T. at 117).  There

was also some confusion regarding the ability of the student to function on her grade

level in a general education classroom. Ms. Owens based her opinion that the student needed an out of general education setting on a statement by the classroom teacher indicating that the student was working on a pre-primer level, while the other students were working on a second grade level. (T. at 65-66). At hearing, however, Ms. Murphy indicated that the student is an active member of the class and is on par with the other students. (T. at 292).

There also appears to be some confusion over the statements of Ms. Kimberlee Pope, the Speech-Language Pathologist for River. Plaintiff asserts that Ms. Pope's evaluations supported the proposition that Key would be a more appropriate placement for the student. (M. at 20). This is incorrect, as DCPS twisted the facts that Ms. Pope's recommendations relied on. Specifically, Ms. Pope recommended that the student be placed in an environment with a low student-to-teacher ratio. (R. at 50). DCPS asserted that at Key there were twelve students total in its entire program, whereas at the River School there are nine typical students in addition to the three Hearing Impaired students for a total of twelve students in the class. (T. at 78, 145-146, 210). What DCPS failed to mention is that, at the River School, in addition to the classroom teacher, a full- time speech and language pathologist is in the classroom in order to assist the three Hearing Impaired students. (R. at 288). Thus, although there are more students in the classroom at River, the ratio of students to teachers is actually lower.

In making a placement decision, the HO is required to take into account the possible detrimental effects that a change in placement might have. *Visco v. School Dist.*, 684 F. Supp. 1310, 315 (W.D. Pa. 1988) (explaining that, "it is necessary to consider the individual requirements of the child or children in question along with the

potential harm a program may present"); *Seattle School District No. 1 v. B.S.*, 82 F. 3d 1493, 1501 (9th Cir. 1994) (citing 34 C.F.R. § 300.552(d), which says, "In selecting the [least restrictive environment], consideration is given to any potential harmful effect on the child."). If the hearing officer must make a decision as to whether to move a student from one program to another, he must balance the possible benefits against the potential harm to the child. *Visco*, 684 F. Supp. at 1315. However, once a student is making adequate progress in one program, a change must be viewed with caution. *Id.* In fact, even if the potential benefits and potential harms weigh equally, the student should not be moved. *Id.*; *Grkman v. Scanlon*, 528 F. Supp. 1032, 1037 (W.D. Pa. 1981) (asserting, as a rationale for giving preference to the current placement, "always change a losing game – never change a winning game" and it is important to maintain momentum).

At the hearing, the parent presented a great deal of evidence regarding the possible detrimental effects that a change in placement would have on the student. For instance, the student's mother, Carolyn Jeppsen, testified that a change from River to Key would result in a loss of typical peer models, which, "has huge speech and language consequences for her." (T. at 174). Ms. Jeppsen also talked about the emotional impact that such a change would have. The student has been in a general education classroom for the last four years, and "[t]o go from a school that she has been familiar with, she is comfortable with, she is successful, she is accepted as normal, she is not segregated in any way, to then be put in a program where she is going to be segregated in every way, I think, will have emotional impact, which will then affect her attention and her ability to attend and learn language." (T. at 174). DCPS failed to refute any of these assertions.

The plaintiff argues that the HO found for the parents on the issue of placement

because DCPS did not present enough witnesses.  (M. at 21).  This is incorrect.  Instead,

the HO found that DCPS did not present sufficient evidence that spoke to the individual

needs of the student.  (R. at 13).  This distinction is important because the law clearly

holds that "[i]ndividualization must be the touchstone for the analysis."  *Visco*, 684 F.

Supp. at 1314.  The HO's decision is supported by the record, which shows that in four

years that the student has been in River, DCPS has never ordered any assessments of

their own in order to evaluate the needs of the student.  (T. at 57).  This is noteworthy

because courts have declared that it is essential for school officials to become

knowledgeable about a student's individual needs before making an appropriate

placement decision.  *McKenzie v. Smith*, 771 F.2d 1527, 1532 (D.C. Cir. 1985).  In

determining whether the officials have become sufficiently knowledgeable, courts have

looked to the familiarity of the school officials with the student, as well as the

involvement of the officials in formulating previous educational programs.  *Id.*

(explaining that the court placed a great deal of importance on the opinions of those who

knew the student best, including the personnel at his current placement and his parents,

and took notice of the fact that DCPS had never been directly involved in providing the

child's education, and had at best participated secondarily in developing his IEPs).  Even

more alarming was a statement made by Ms. Roberts, in which she said, "every meeting

that I go to is always the same.  We always agree on the goals, those are fine, but when it

comes down to the disability classification, I always stand the same…I know my

supervisor stated the same thing" (T. at 118).  Statements such as this reveals the

intentions of DCPS to categorize all special education children together, without respect

for their individual needs.

The plaintiff attempts to bolster its argument by citing a later decision rendered by the same HO, in which the issue was the appropriateness of placement at Key.  (M. at 21).  While the mention of this decision is wholly irrelevant to the present case, it proves further that the plaintiff has completely failed to make a placement decision with the unique needs of the student in mind.  While this case shares some similarities with the *Wahl* matter, the individual needs of each student is different.  The fact that the *Wahl* matter was adjudicated by the same HO provides strong evidence that the HO, as opposed to the plaintiff, takes into account the individual needs of each student in making placement decisions.  By citing this decision, the plaintiff is reinforcing the legitimacy of the HO's conclusion that DCPS failed to meet its burden to show that this placement was appropriate to meet the unique needs of this particular student.  (R. at 13).

## CONCLUSION

Mr. Schmidt, who was not in attendance at the November 17, 2004 meeting, stated that, in his opinion, River is changing classifications of the students in order to stop them from being transferred to Key.  (M. at 23).  But it appears as though DCPS, and not River, has a predetermined agenda when it comes to placement.  On May 5, 2004, Mary O'Leary Kane, Director of Speech and Language Services at River had a telephone conversation with Dwight Thomas, a DCPS Placement Specialist.  During this conversation, Mr. Thomas informed Ms. Kane that DCPS intended to "get all of the DC kids out of the River School program and send them to Key."  (R. at 63).  Ms. Kane followed up with Mr. Thomas by sending him a letter to confirm that she understood him correctly.  (R. at 63).  Mr. Thomas never responded to refute this statement.  On May 26, 2004, a Notice of Placement was issued, changing the student's placement from River to

Key.  At this time, the student's IEP had not yet been completed.  It was not until November 17, 2004 that the MDT team reconvened to complete the student's IEP.  (R. at 2).  Following this meeting, DCPS again proposed Key as the student's placement.  (R. at 4).

This kind of predetermination is a clear violation of IDEA.  Placement decisions are required to be based on the student's **unique needs**, which is why the regulatory provisions suggest that IEP and placement issues are separate and *successive* considerations.  *Aw v. Fairfax County School Board*, 372 F.3d 674, 683 n.10 (4th Cir. 2004) (referring to 34 C.F.R. pt. 300, app. A, which notes that "the appropriate placement for a particular child ...cannot be determined until after decisions have been made about the child's needs and the services that the public agency will provide").  Furthermore, the courts have held that school representatives should not come to placement meetings with a required course action, before discussing the individual needs of the child.  *Deal v. Hamilton County Board of Education*, 392 F.3d 840 (6th Cir., 2004).

At hearing, the parent provided evidence that a change of placement from River to Key would have detrimental effects on the student.  (T. at 174).  DCPS failed to refute this evidence.  DCPS also failed to show that Key was an appropriate placement to provide FAPE for this student.  For these reasons, the HO properly found that DCPS failed to sustain its burden of proof that Key is an appropriate placement for this student.  Accordingly, this honorable court should uphold the HOD.

Respectfully submitted,

_____/s/_____
ELLEN DOUGLASS DALTON, Esq.
Counsel for the Defendant

Bar #411612
Dalton, Dalton, &  Houston P.C.
1008 Pendleton Street
Alexandria, Virginia 22314
(703) 739-4300
(703) 739-2323

December 14, 2005

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THE DISTRICT OF COLUMBIA          :
                                  :
                                  :     Civil Action No. 05-1309
          Plaintiff,              :     (RJL)
                                  :
v.                                :
                                  :
JEPPSEN                           :
                                  :
          Defendant               :
                                  :
_____  :

## DEFENDANT'S STATEMENT OF MATERIAL FACTS

1. The student is seven years old and wore hearing aides until 2001, at which time she received a cochlear implant.  (R. at 41) (T. at 71-72).

2. The student was enrolled in the River School in September 2000, and was in attendance at that school at the time of hearing.  (R. at 2).

3. An IEP meeting was convened on June 21, 2004, but was not completed that day and the members agreed to reconvene.  (R. at 54).

4. On July 2, 2004 the team members from the River School as well as the Parent convened to finish the IEP and discuss placement, but the LEA representative from DCPS did not show up.  (R. at 54).

5. On July 21, 2004, Mr. Thomas, placement specialist for DCPS, sent an email proposing three proposed dates, July 28th, 29th, and 30th, but these dates did not work, as they occurred after the conclusion of the school year.  (R. at 54).

6. When school reopened in September, the student's mother contacted Mr. Thomas,

but he was no longer handling the matter, as it had been turned over to Pamela Owens. (R. at 54).

7. On August 26, 2004, Ms. Owens contacted the River School and advised them that a Notice of Placement had been issued for the student to attend the Key School. (R. at 54).

8. A Request for Due Process Hearing was filed contending that DCPS violated the parent's rights by unilaterally making a placement decision without convening a meeting to finish the development of the IEP and discuss placement in accordance with 34 C.F.R. § 300-501(c); 34 C.F.R. § 300-345; 34 C.F.R. § 300-552. (R. at 54).

9. The parties entered into a Settlement Agreement which required DCPS to convene an IEP meeting on or before November 30, 2004. The team was required to review all evaluations, review and revise the IEP if necessary, discuss and determine placement and issue a Notice of Placement, if public within 5 days and if private within 30 days. (R. at 54).

10. An MDT/IEP meeting was held for the student on November 17, 2004. (R. at 2).

11. Initially, DCPS told the parent that the IEP meeting would be held at the Key School, but eventually agreed to hold it at the River School. (R. at 54).

12. The participants at the meeting included the parent, her counsel, members of the River School including the student's classroom teacher and service providers, and DCPS personnel including staff members of Key Elementary school. (R. at 2).

13. The participants reviewed the student's most recent speech & language evaluation prepared by the speech & language pathologist who provides the student services

at River.  (R. at 2).

14. All of the members agreed that the student had multiple disabilities including SLI, HI and OHI.  (R. at 3).  All of the members also agreed to the number of hours of specialized instruction, the related services and the goals and objectives for the IEP.  (R. at 3).

15. There was disagreement as to whether the student's primary disability classification was SLI or HI.  (R. at 3).

16. There was also disagreement as to whether the student's specialized instruction should be delivered in a general education inclusion setting or in a full time special education setting.  (R. at 3).

17. Two IEPs were developed at the meeting.  (R. at 3).

18. One IEP was developed by 6 DCPS personnel, 3 of which had never even observed the student.  This IEP contained the following weekly services: 1 hour of speech/language therapy, 25.5 hours of specialized instruction, and 1 hour of audiology.  The IEP indicated that the amount of time the student was to be out of a regular education setting was 98% of the time.  (R. at 3).

19. The other IEP was developed by the student's teacher, speech & language pathologist, audiologist, and Director of the speech & language services at the River School.  The parent was in agreement with this IEP.  This IEP prescribed that the student's specialized instruction and group speech/language therapy be delivered by a special education teacher and a speech language pathologist in a general education setting, 1 hour of individualized speech language therapy, and 1 hour of audiology.  The percent of time the student was to be out of a regular

education setting was 6%.  (R. at 3).

20. Following the meeting, DCPS announced that they were continuing to propose the Key School for the student's placement.  (R. at 4).

21. On November 23, 2004, a Request for Due Process Hearing was filed.  (R. at 130).

22. In a decision dated March 28, 2005, the HO concluded that DCPS had sustained its burden of proof that the IEP was developed to meet the unique needs of the student, and that it had presented sufficient evidence that the placement decision was made with participation of the parent, but it had not sustained its burden of proof in demonstrating that the proposed change of placement was appropriate. (R. at 12).

Respectfully submitted,

_____/s/_____
ELLEN DOUGLASS DALTON, Esq.
Counsel for the Defendant
Bar #411612
Dalton, Dalton, &  Houston P.C.
1008 Pendleton Street
Alexandria, Virginia 22314
(703) 739-4300
(703) 739-2323

December 14, 2005