# DISTRICT OF COLUMBIA PUBLIC SCHOOLS
## *State Enforcement and Investigation Division*
### CONFIDENTIAL
## Coles B. Ruff, Jr., Due Process Hearing Officer

| | |
|---|---|
| In the Matter of Mia Jeppsen<br>Date of Birth: July 6, 1998<br><br>Petitioner (Student),<br><br>v.<br><br>District of Columbia Public Schools<br>("DCPS" or "District")<br>Home School: Lafayette ES<br>Respondent. | **IMPARTIAL DUE PROCESS**<br>**INTERIM**<br>**HEARING OFFICER'S DECISION**<br><br>Hearing Date: March 9, 2005<br>Hearing Record Closed March 14, 2005<br>Held at: 825 North Capitol St. NE<br>Washington, DC |

2005 MAR 28 PM 4: 41   STUDENT HEARING

Hearing Participants:
Counsel for Student:

Ellen Douglas Dalton, Esq.
1008 Pendleton Street
Alexandria, Va. 22214

Counsel for DCPS:

Jack Screibman, Esq.
Office of General Counsel
825 North Capitol St. NE
Washington, DC 20002

## INTRODUCTION:

A Due Process Hearing was convened on March 9, 2004, at the headquarters of the District of Columbia Public Schools, 825 North Capitol Street, NE, Washington, DC 20002. The hearing was held pursuant to a hearing request submitted by the counsel for the student filed November 29, 2004.

## JURISDICATION:

The hearing was conducted and this decision was written pursuant to the *Individuals with Disabilities Act* (I.D.E.A.), P.L. 101-476, as amended by P.L. 105-17, the Rules of the Board of Education of the District of Columbia and the DC Appropriations Act, Section 145, effective October 21, 1998.

## DUE PROCESS RIGHTS:

The student's counsel waived a formal reading of the due process rights.



**DEFENDANT'S EXHIBIT C**

In the Matter of MJ    DOB: 7/6/98    HOD: March 28, 2005

## SUMMARY OF THE RELEVANT EVIDENCE:

The Hearing Officer considered the representations made on the record by each counsel, the testimony of witnesses, and the documents submitted in the parties' disclosures (MJ 1-14 and DCPS 1-5) which were admitted into the record.[1]

## FINDINGS OF FACT:

- The student's current age is six years - eight months. She has been determined to be a child with a disability with a profound hearing loss. She began attending the River School (River) in September 2000 and has continued to attend River for the past four school years. (Parent's testimony)

- The parent's counsel and DCPS signed settlement agreement dated November 9, 2004, in which DCPS agreed to continue funding the student's placement at River until it conducted a multi-disciplinary team/individualized educational program (MDT/IEP) meeting to review and revise the student's IEP and discuss and determine placement. (MJ 8)[2]

### The IEP and MDT/IEP Meeting:

- DCPS convened the MDT/IEP meeting on November 17, 2004. The participants included the parent, her counsel, members of the River staff including the student's classroom teacher and service providers, and DCPS personnel including staff members of Key Elementary school (Key), the school DCPS proposed as a possible placement for the student. Ms. Owens, the DCPS non-public day school coordinator who monitors DCPS students placed at River, served as the DCPS local education agency (LEA) representative at meeting. (MJ 7, Ms. Owens testimony)

- Ms. Owens requested that the staff members at Key attend the meeting because of their expertise in servicing students with hearing impairment and to discuss and describe the program at Key to the full MDT. DCPS did not conduct any of its own evaluations of the student. However, Ms. Owens briefly observed the student at River School and Ms. Amy Roberts, a certified teacher of the hearing impaired at Key, conducted a classroom observation of the student at River. (Ms. Owen's testimony, Ms. Robert's testimony)

- The MDT members reviewed the student's most recent speech language evaluation prepared by the speech language pathologist (SLP) who provides the

---

[1] The evidence that is the source of the finding of fact is noted within a parenthesis following the finding.

[2] In September 2004, DCPS initiated a change of placement for the student because of the recent creation of a public program for hearing impaired students housed at Key Elementary School. The parents rejected the placement and filed a due process hearing request which resulted in the settlement agreement.

In the Matter of MJ    DOB: 7/6/98    HOD: March 28, 2005

student services at River. All the MDT members agreed that the student had multiple disabilities including other health impairment (OHI)[3], hearing impairment (HI), and speech/language impairment (SLI). All members of the team also agreed to the number of hours of specialized instruction, the related services and the goals and objectives for the IEP. However, there was disagreement between the DCPS team members and the River staff as to whether the student's primary disability classification was HI or SLI. The student's primary disability in her previous IEP was HI. (Ms. Owens testimony, DCPS 1-meeting notes)

- There was also disagreement whether the student's specialized instruction should be delivered in a general education inclusion setting as done at River or whether the services should be delivered in a full time special education setting designed to prepare the student for mainstreaming as at Key. DCPS drafted the IEP that contained the following weekly serves: 1 hour of speech/language (S/L) therapy, 25.5 hours of specialized instruction and 1 hour of audiology. The IEP indicated that the student disability classification was multiply disabled (MD) and listed each of the disabilities. The IEP indicated that the amount of time the student was to be out of a regular education setting was 98% of the time. (DCPS 1)

- As a result of the disagreements the parent indicated on the IEP that the she did not agree with its contents. Consequently, the parent and members of the River staff drafted an alternative IEP document which also indicated a MD classification but listed LSI as the first of the three disabilities. The alternative IEP also prescribed that the student's specialized instruction and group speech/language therapy be delivered by a special education teacher and a speech language pathologist (SLP) in a general education setting.[4] The IEP document also indicated that 1 hour of individualized S/L therapy and 1 hour of audiology would be delivered in a special education setting. The percent of time the document proposed the student be out of a regular education setting was 6%. (MJ 13)[5]

---

[3] The student's OHI disability is the result of her condition of attention deficit hyperactivity disorder (ADHD).

[4] The IEP document drafted by the River staff was begun during the meeting with the entire MDT team and DCPS staff members were aware of the parent's intention to draft the alternative IEP document and separate IEP notes; however, the documents was completed after the DCPS staff concluded the meeting. A copy of the IEP document was provided to DCPS when it was disclosed for the due process hearing. (Ms. Owen's testimony)

[5] The goals and objectives in the DCPS IEP and the River IEP document were identical. Pages 2 and 4, sections entitled: "Present Educational Performance Levels in Areas Affected by the Disability", "Least Restrictive Environment (LRE) Determination" and "Placement Considerations and Justification" in the two documents were different. The document created by the River staff cited the more recent October 2004 S/L evaluation and indicated that the student should be in a general education setting with full time service of a speech pathologist in the classroom.

3

In the Matter of MJ   DOB: 7/6/98   HOD: March 28, 2005

- Following review of the student's evaluation, the disability classification and the IEP goals and objectives, the MDT members discussed the benefits of the student staying at River or being moved to Key. No other placement options were presented or discussed at the meeting. The parent and the River staff asserted that the student's placement should remain River. DCPS considered the provision of 25.5 hours of specialized instruction to require a special education setting and asserted that Key was the appropriate placement. At the conclusion of the meeting DCPS issued a prior notice of placement for the student to be outside of general education setting and for her placement location to be changed from River to Key. (Ms. Owen's testimony, MJ 12, DCPS 1 - page 4, DCPS 3)

## The Student's Disabilities and Classroom Performance:

- The student wore hearing aides until April 2001 when she received a cochlear implant. The cochlear implant sends auditory sensation to the brain and as result of and with the implant the student has hearing ability categorized as a "mild hearing loss."[6] However, without the implant the student is profoundly deaf. The student will always be hearing impaired. (Parent's testimony, Ms. O'Leary Kane's testimony)

- With the implant the student can hear a broad range of sounds; however, she does not necessarily understand language and what is being said. She can discriminate between different words because she can hear all the elements of the sound. However, she may not be able to understand words when they are strung together with other words. Because the student's corrected hearing is now comparable to mild hearing loss and the student's challenges with speech and language are now most impacting her academic performance, the River staff members were of the opinion that the student's primary disability was SLI. (Ms. Pope's testimony, Dr. Mertes' testimony)

- At River the student participates fully in her classroom and with her non-disabled peers with support services from the SLP. The student could not access the general curriculum and be successful in a general education classroom without a speech pathologist in the classroom full time.[7] The student is provided the same academic work as the other students in the classroom and can perform on par with the other students academically. The student has progressed significantly in the current school year. She is interacting and speaking more spontaneously than in the previous school year, using longer utterances and more correct syntax and asking and answering more questions. Communication with non-disabled peers

---

[6] Even with the cochlear implant the student does not hear as a person without a hearing loss and the student has to be trained to interpret the sounds she perceives.

[7] The assistance the SLP provides the student includes pre-teaching concepts, preparing modified teaching materials, sending items home for parents to work with the student, pulling the student aside to review directions, repetition of concepts to make certain she is comprehending, facilitating interaction between the student and her peers, leading the group of disabled students during the co-teaching process.

In the Matter of MJ    DOB: 7/6/98    HOD: March 28, 2005

for language modeling has been important part of the student's progress. The student would likely regress with a change of placement to Key and to a self contained special education classroom. (Ms. Sundaramurthy's testimony, Ms. Pope's testimony)

- The student uses an FM system to have the classroom teacher instructions "narrowcasted" to her. The FM system helps her to attend because of her ADHD and so she does not have to hear over background noise in the classroom. (Ms. Pope's testimony)

- The student most recent speech/language evaluation conducted in October 2004 indicated that the student has receptive language skills at approximately 3 year - 4 month age equivalency and expressive language at age equivalence of approximately 3 years - 0 months. (Ms. Pope's testimony, MJ 7)

- The student also has dyspraxia which is a motor speech disorder for which the student receives additional speech/language services outside school. The SLP uses tactile and motor techniques to remediate the condition. (Ms. Hoffower's testimony)

### The Proposed Placements:

- River is a full time general education school that serves non-disabled students and also services students with varying degrees of hearing loss who are classified with a disability. 90% of the students at River are non-disabled students. River's teaching model uses a full time general education teacher and a full time speech/language pathologist to co-teach both the disabled students and their non-disabled peers in a general education classroom. The student's current classroom teacher at River, however, is certified as a special education teacher. There are thirteen students in her current classroom, ten of whom have no disability and are general education students. The student is one of three students who have been designated as a child with a disability and to whom the speech/language pathologist focuses assistance during the classroom instruction. (Ms. O'Leary Kane's testimony, Ms. Pope's testimony, Ms. Sundaramurthy's testimony)

- The DCPS city-wide hearing impaired (HI) program is housed at Key which is a general education elementary school for students from pre-K through 5th grade. The HI program at Key, began during the 2003-04 school year, is designed to provide services to students who have the disability of HI. The program is housed in a general education school so that students in the program can be mainstreamed into general education classrooms with non-disabled peers. The students are mainstreamed into special subject areas including art, physical education and, library with non-disabled peers. Until their level of proficiency is sufficient to assess the core academic general education curriculum the student's specialized instruction is provided by a certified special education teacher who has been

In the Matter of MJ    DOB: 7/6/98    HOD: March 28, 2005

- Because the Key HI students also have a speech/language disability due to their hearing loss the program provides speech/language therapy from a certified SLP. However, the SLP does not co-teach in the classroom as in the River model. (Ms. Robert's testimony)

- All the students in the Key HI program, and the classroom proposed by DCPS for the student at Key, have the HI disability and there are no general education students in that classroom. None of the current students have a cochlear implant. At the Key program there are currently three special education teachers one for pre-K students, one for kindergarten students and one for first graders. There are four students is pre-K, two in kindergarten and six in first grade; however, all the students may not be operating on grade level in academic skills. (Ms. Robert's testimony, Mr. Schmidt's testimony)

- The special education teachers at Key teach regular academic skills in math, reading social studies and science at a modified speed and to the students' ability based on language, speech and auditory levels. The teachers focus daily on auditory development, speech production tasks and teaching the students language to help them learn academics. (Ms. Robert's testimony, Mr. Schmidt's testimony)

- The classrooms at Key are equipped with a sound field system which amplifies the teacher's voice so it can be heard by all students in any part of the classroom. Each student wears a hearing aide and uses the sound field system. When a HI student is in a mainstreamed classroom an FM system is used to amply the teacher's voice to only the HI student wearing a devise that receives the FM signal. (Ms. Robert's testimony)

- The program is designed to educate students in language, and other areas so they can be eventually mainstreamed. The students in need of support in any of the mainstreamed classroom will be supported by a teacher for the hearing impaired in that classroom based on the teachers' availability and scheduling. (Ms. Robert's testimony)

- Key uses the Ling method of teaching speech to death and hard of hearing students to determine what speech sounds are missing for the student and those are targeted and addressed. Teachers of the hearing impaired are trained in this method. Most SLP are not trained in this method. Key also has an audiologist on call to assist with the cochlear implant. (Mr. Schmidt's testimony)

- Based on the evaluations the Key staff believed the student was not yet ready to be mainstreamed. The student's language delays raised concern for the Key staff that SL therapy in a regular education setting has not seemed to have had enough impact on the student's abilities even after years with the implant. (Dr. Schmidt's testimony)

In the Matter of MJ   DOB: 7/6/98   HOD: March 28, 2005

The parent is concerned that the student might become inattentive because the sound system is loud and that the student would be without the peer interaction from which she learns at River. She fears the emotional consequences to the student in being moved from her current school to one in which the disabled student are segregated. (Mother's testimony)

## ISSUES(s):

Did DCPS deny the student FAPE by:

1. Failing to provide the parent full participation in the placement decision, specifically was the placement at Key pre-determined prior to developing her IEP thereby precluding any meaningful placement discussion in violation of 300.501(b) and 2(c)(1) and 300.552?

2. Failing to develop an IEP that meets the student's unique and individual needs in accordance with 34 CFR 300.344 and 34 CFR 300.346?

3. Issuing a Notice of Placement[8] to a program that is more restrictive than the student's current educational placement when she had demonstrated that she can be educated and in fact benefits educationally from a less restrictive environment in violation of 34 CFR 300.550?

## CONTENTIONS OF THE PARTIES:

DCPS counsel asserted the following:

1. There was no dispute that the entire team agreed on the goals and objectives for the IEP and the amount specialized instruction and related services that were required.
2. The IEP meets the unique and individual needs of the student.
3. There was no dispute that the entire team agreed that the student should be classified as having multiple disabilities.
4. With a cochlear implant the student still has an impaired signal, and consequently, her primary disability is HI not SLI.
5. A teacher of the Hearing Impaired is better trained to work with the student than a speech pathologist.
6. DCPS did not violate the parents' rights regarding placement because a full placement discussion took place.
7. Every member of the River School testified that they were provided with a full description of the Key program by the personnel from Key.
8. DCPS did not violate parents' rights by issuing a Notice of Placement to Key because this program is a less restrictive environment than River.

---

[8] Parent's counsel alleged that the placement notice did not sufficiently address why the placement proposed by the parent was rejected; however, this was not a specific violation alleged in the hearing request.

In the Matter of MJ    DOB: 7/6/98    HOD: March 28, 2005

9.  As required by 34 CFR 34 § 300.552, the placement decision was based on the IEP.
10. Both Mr. Schmidt and Ms. Roberts testified that because the student has a cochlear implant, it should be expected that her functioning level is closer to her current age instead of that of a two-three year old.
11. Mr. Schmidt testified that she needs a teacher who is trained to work with a student who is Hearing Impaired for her to progress at a better rate.
12. The program at Key will allow the student to be taught by a trained teacher of the Hearing Impaired and will be able to help her progress in order for her to be mainstreamed into a typical class at Key.
13. Consequently, the placement at Key is the LRE at this time in the student's educational career.
14. Although the parent preferred placement and funding at the River School, that placement is only considered if DCPS denied Mia FAPE, by not making an otherwise appropriate placement.
15. Under Shaw v. DC the LEA ultimately decides the appropriate education method.
16. Under D.C. Code § 38-25-01, DCPS is required by law to first consider a public school. When DCPS has a public program that is appropriate it is allowed to pull student's out of a private school that DCPS previously funded.

The parent's counsel asserted the following:

1.  Any one of the above violations, supported by the evidence, is sufficient standing alone to grant the parents' requested relief.
2.  The hallmark of IDEA is that disabled children be educated to the extent possible in the least restrictive environment.
3.  DCPS is required to provide a continuum of placements from the least to the most restrictive.
4.  The evidence established that the student's current placement at River is in a general education setting and is the least restricted.
5.  The prior notice was flawed in that the LEA failed to state the reason for rejecting the general education.
6.  DPCS witness confused the term least restricted environment as relating to the type of teacher instead of the type of children with whom the student is educated.
7.  The evidence points to the fact that the student is thriving in a general education setting with the proper support and accommodations.
8.  No DCPS witness reviewed records other than the S/L evaluation and Mr. Schmidt never spoke with the teacher or SLP.
9.  Every child's progress is unique and depends on a variety of factors including but not limited to his or her own unique disabilities.
10. The overwhelming evidence is that the student's primary disability is SLI.
11. The evidence clearly demonstrated the student is need of full time support of a SLP which she would not receive at Key.
12. The SL evaluation did not test her academic abilities. The teacher testified she is on par with her other students.

In the Matter of MJ   DOB: 7/6/98   HOD: March 28, 2005

13. The common thread is DCPS' plan to move students for River to Key and the evidence showed that the DCPS representative did not discuss placement options and were unwilling to consider the River school thereby precluding any meaningful placement discussion.

## CONCLUSIONS OF LAW:

Pursuant to 5 DCMR 3022.16 DCPS bears the burden of proof, based solely upon the evidence and testimony presented at the hearing, that the action or proposed placement is adequate to meet the educational needs of the student.

1. Did DCPS deny the student FAPE by failing to provide the parent full participation in the placement decision, specifically was the placement at Key pre-determined prior to developing her IEP thereby precluding any meaningful placement discussion in violation of 300.501(b) and 2(c)(1) and 300.552? [9]

Conclusion: DCPS sustained its burden of proof.

It is undisputed that DCPS initiated a change of placement for the student because of the recent creation of public program for hearing impaired students housed at Key. The parents rejected the placement and filed a due process hearing request which resulted in the settlement agreement and the subsequent IEP development and placement decision. DCPS proposed the same placement at the November 2004 MDT meeting. The parent and her counsel clearly anticipated that DCPS intended to propose Key again and even sent personnel from the student's current placement to observe Key.

It is completely legitimate for DCPS to make a decision to utilize public resources to create a program that meets the needs of its student which have heretofore been provided

---

[9] 34 CFR § 300.501(b) provides:
  (1) Each public agency shall provide notice consistent with § 300.345(a)(1) and (b)(1) to ensure that parents of children with disabilities have the opportunity to participate in meetings described in paragraph (a)(2) of this section.
  (2) (c) Parent involvement in placement decisions. (1) Each public agency shall ensure that the parents of each child with a disability are members of any group that makes decisions on the educational placement of their chi d.

34 CFR § 300.552 provides:
  that in determining the educational placement of a child with a disability, including a preschool chi d with a disability, each public agency shall ensure that --
  (a) The placement decision --
  (1) Is made by a group of persons, including the parents, and other persons knowledgeable about the child, the meaning of the evaluation data, and the placement options; and
  (2) Is made in conformity with the LRE provisions of this subpart, including §§ 300.550-300.554;

  (b) The child's placement --
  (1) Is determined at least annually;
  (2) Is based on the child's IEP; and
  (3) Is as close as possible to the child's home;
  (c) Unless the IEP of a child with a disability requires some other arrangement, the child is educated in the school that he or she would attend if non-disabled;
  (d) In selecting the LRE, consideration is given to any potential harmful effect on the child or on the quality of services that he or she needs; and
  (e) A child with a disability is not removed from education in age-appropriate regular classrooms solely because of needed modifications in the general curriculum.

In the Matter of M.J    DOB: 7/6/98    HOD: March 28, 2005

in a private school setting with public funding. DCPS is bound by D.C. Code § 38-2501 to first place a student at a public school if the public placement appropriate. Nonetheless, in making any transition of students from one program to another the decision has to be made on a case by case basis with careful attention to fulfill the legal requirements that the individual needs of the student govern the placement decision.

The evidence indicates with regard to this student the there was a full discussion of the proposed placements and all team members discussed the student's evaluations, abilities and gave their opinions as to the appropriate placement. There was no outstanding evidence that would lead the Hearing Officer to conclude that placement decision was predetermined by DCPS.

Following the placement discussion there was a disagreement between the DCPS personnel and the parent. As the parent stated, at the MDT meeting the parties agreed to disagree. DCPS counsel aptly pointed to Shaw v. The District of Columbia, 238 F. Supp. 2d 127, 139 - to support the proposition that IDEA does not provide that agency must provide an education designed according to the parent's desires.

In most instances a placement will be agreed upon between the educational agency and parents. If disagreements exist they are usually resolved through a due process hearing. The Hearing Officer concludes that DCPS presented sufficient evidence that the placement decision was made with full participation of the parent despite the disagreement that resulted regarding the placement at the end of the discussion.

2. Did DCPS deny the student FAPE by failing to develop an IEP that meets the student's unique and individual needs in accordance with 34 CFR § 300.344[10] and 34 CFR 300.346?[11]

Conclusion: DCPS sustained its burden of proof that the IEP was developed to meet the unique needs of the student.

There was insufficient testimony that the entire MDT reviewed the student's most recent evaluation and participated in the development of the student's IEP. The team thoroughly discussed this student's communication needs and agreed to the services to be provided. Both DCPS and representatives of the River school agreed that the student

---

[10] Parent's counsel only cited language of 34 CFR § 300.344 as further support for the proposition that the IEP is to be designed to meet the unique needs of the student.

[11] 34 CFR § 300.346 provides in pertinent part:
In developing each child's IEP, the IEP team, shall consider --
(i) The strengths of the child and the concerns of the parents for enhancing the education of their child;
(ii) The results of the initial or most recent evaluation of the child: and
(iii) As appropriate, the results of the child's performance on any general State or district-wide assessment programs.
(2) Consideration of special factors. The IEP team also shall --
... (iv) Consider the communication needs of the child, and in the case of a child who is deaf or hard of hearing, consider the child's language and communication needs, opportunities for direct communications with peers and professional personnel in the child's language and communication mode, academic level, and full range of needs, including opportunities for direct instruction in the child's language and communication mode.

In the Matter of MJ    DOB: 7/6/98    HOD: March 28, 2005

There was insufficient testimony that the entire MDT reviewed the student's most recent evaluation and participated in the development of the student's IEP. The team thoroughly discussed this student's communication needs and agreed to the services to be provided. Both DCPS and representatives of the River school agreed that the student required 25.5 hours of specialized instruction and related services of speech/language and audiology.

Although there was some conflicting testimony as to the validity of the most recent S/L evaluation because it was conducted in less than a year of the previous evaluation, and there was no apparent review of the student present levels academic performance through a recent educational evaluation, the parties, nonetheless agreed on the all the student's goals and objectives. In fact, the student's current teacher and related service providers were the core authors of the goals and objectives.

All the MDT members agreed that the student had multiple disabilities including OHI, HI and SLI. There was disagreement whether the student's primary disability classification was HI or SLI. It is not clear that prior to the proposed change of placement whether any of the student's three disabilities were designated as primary. There was some testimony that the student's primary disability was previously HI. But it was not clear what the change circumstances were to warrant a changed the student's primary disability classification. It could not have been the cochlear implant as the student has had the benefit of the implant for four years.

The primary disability generally will determine what services and goals and objectives are predominate in a student's curriculum and may in some instances determine the placement if a placement focuses on a particular disability classification more than others. Nonetheless, the placement determination is not to be based on the student's classification as much as the unique needs of the student.

Despite the number of witnesses who testified that the student's primary disability is SLI, it appears that the core reason presented for the "change" in primary disability was to dictate the placement. What appears to be at the heart of this dispute is not the contents of the IEP but the setting in which the services prescribed by the IEP will be delivered and the teaching methodology and/or model to be used to deliver the individualized services to the student.

The Hearing Officer concludes that there is fundamentally no dispute over the appropriateness of the IEP but a dispute over the setting and teaching methodology to be used in implementing the student's IEP. Therefore, the Hearing Officer concludes that DCPS has met its burden that the IEP was developed to meet the unique needs of the student.

3. Did DCPS deny the student FAPE by issuing a notice of placement to a program that is more restrictive than the student's current educational placement when she had

In the Matter of MJ   DOB: 7/6/98   HOD: March 28, 2005

demonstrated that she can be educated and in fact benefits educationally from a less
restrictive environment - a violation of 34 CFR 300.550?[12]

Conclusion: DPCS did not sustain its burden of proof in demonstrating that the proposed
change of placement was appropriate.

IDEA requires that in providing special education children with disabilities be educated
in the least restrictive environment (LRE) and, to the extent appropriate, with children
who are non-disabled. Mainstreaming is the term generally used to describe placing
disabled students with non-disabled peers. However, meeting the LRE requirement does
not require that a disabled child be educated in the same classroom with non-disabled
children in all circumstances. The placement must be appropriate.

The parent's counsel asserts that the student's placement at River is the least restrictive
environment because the student is receiving full time education with non-disabled peers.
However, the testimony was clear the student could not access and benefit from the
general education setting without the support of a full time speech pathologist in the
classroom.

In essence, the student is receiving speech language services on a full time basis
comparable to the student having a dedicated aide; in this case, a dedicated service
provider. It is clear that the student is hearing impaired. Without the cochlear implant she
is deaf. It is undisputed that most children with hearing impairment have S/L
impairment. The major dispute is how the student's multiple disabilities are best
addressed. This, in the opinion of the Hearing Officer, amounts to a question of
methodology.

The River method may be an effective means for meeting the individual needs of this
student, but not necessarily the only appropriate means of meeting those unique needs.
DCPS put forth credible testimony that it uses a viable method of educating students with
HI and SLI combined disabilities in a quasi inclusion model with efforts to quickly
transition students according to their abilities to full time mainstreaming.

If the student actually needs the services of a full time SLP in a general education
classroom the student could also possibly access the general education curriculum at her
home school with the support of a full time SLP. This is perhaps another possible
"methodology" that might be, at some time in the future, considered for her or some other
student.

---

[12] 34 CFR § 300.550 provides:

DCPS shall ensure --
(1) That to the maximum extent appropriate, children with disabilities, including children in public or private institutions or
other care facilities, are educated with children who are non-disabled; and
(2) That special classes, separate schooling or other removal of children with disabilities from the regular educational
environment occurs only if the nature or severity of the disability is such that education in regular classes with the use of
supplementary aids and services cannot be achieved satisfactorily.

12

In the Matter of MJ    DOB: 7/6/98    HOD: March 28, 2005

Placement sometimes involves choosing between competing educational philosophies or methodologies. It is generally held that the selection of educational philosophies rests with the educational institution. "[O]nce a court determines the requirements of [Individuals with Disabilities Education] Act have been met, questions of [educational] methodology are for resolution by the States.'" The mainstreaming requirement does not give parents the right "to compel a school district to provide a specific program or employ specific methodology in providing for the education of their disabled child." Schools have the power to provide disabled children with an education they consider more appropriate than that proposed by the parents.[13]

The parent's counsel presented more experts to support a finding that the student's current placement and the methodology used is the most appropriate for the student's needs. These experts have experience and history with this student. They also are part of the River School staff and apparently support its methodology of HI students in a general education setting serviced by a full time SLP co-teaching the class.

The parents understandably want what they believe to be the best for their child. However, the LEA is not required to provide the best but to provide FAPE. Nonetheless, the Hearing Officer is concerned that DCPS did not conduct is own evaluations of the student or present testimony that sufficiently refuted the experts who had significant experience with the student.

Undoubtedly, there will be few instances in a case such as this where DCPS has a greater number than the parent of witnesses with personal experience and observations of a student. The sheer number of witnesses and experts is not the determining factor as to which party will prevail. However, the one expert DCPS presented had not observed the student and had only reviewed her SL report and from that report concluded that the student "must be frustrated" in the current placement setting. Ms. Roberts observed the student at River once for a brief period. DCPS presented significant testimony on its program and methodology for HI/SLI students, but far, far less on this particular student.

The parent as well as the student's current service providers visited Key and credibly testified to the detrimental effects of the student changing placements and adjusting to a new teaching methodology at this juncture of her educational career. Courts have concluded generally that when considering a change in educational methodologies for disabled student's careful attention should be paid to the possible detrimental effects of making a premature change.[14] DCPS may very well have prevailed on this issue had it presented evaluators, witnesses and/or experts who had experience with this student and an ability to more aptly speak to the individual needs of this student. DCPS could have

---

[13] 4-10 EDUCATION LAW § 10.03 citing Board of Educ. v. Rowley, 451 U.S. 176, 208, 102 S. Ct. 3034, 73 L. Ed. 2d 690, 5 Educ. L. R. 34 (1983) and Barnett v. Fairfax County Sch. Bd., 721 F. Supp. 757, 56 Educ. L. R. 802 (E.D. Va. 1989) , aff'd. 927 F.2d 146, 66 Educ. L. R. 64 (4th Cir.) and Hudson ex rel. Tyree v. Wilson, 828 F.2d 1059, 1178, 1182, 421 Educ. L. R. 830 (4th Cir. 1987).

[14] Visco v. School Dist. of Pittsburgh, 684 F. Supp. 1310, 1312-13, 47 Educ. L. R. 142 (W.D. Pa. 1988) .

In the Matter of MJ    DOB: 7/6/98    HOD: March 28, 2005

perhaps even requested that the student spend time at the proposed placement to gauge its potential effectiveness.

IDEA provides that the placement decision be made annually with a review of the student's current levels of performance, progress and prognosis to determine the most appropriate placement. There may be a point at which a legitimate change in the special education methodology and placement is appropriate; however, such a change must be supported by stronger evidence than was presented by DCPS is this case.

**ORDER:**

1. DCPS shall continue to place and fund the student at the River School for the remainder of the current school year.

2. DCPS shall, in a reasonable time prior to the start of the 2005-06 school year, convene a multi-disciplinary team/individualized educational program (MDT/IEP) meeting to review to the student's full records, evaluations and recent progress, and review and revise the student's IEP as appropriate with particular attention to the student's communication goals and objectives.

3. Pursuant to the requirements of 34 CFR 300.552 DCPS shall, within a reasonable time prior to the start of the 2005-06 school year, make a placement determination for the student for the 2005-06 school year and issue valid and complete prior notice of placement.

**APPEAL PROCESS:**

This is the final administrative decision in this matter.  Appeals on legal grounds may be made to a court of competent jurisdiction within 30 days of the rendering of this decision.

Coles B. Ruff, Esq.
Hearing Officer
Date: March 28, 2005

Issued:  3/29/05

14

In the Matter of MJ    DOB: 7/6/98   HOD: March 28, 2005

# MATTER OF  Mia Jeppsen V. DCPS

## INDEX OF EXHIBITS

| EXHIBIT # | IDENTIFICATION | ADMITTED |
|-----------|----------------|----------|
| MJ 1-14 | Parent's Disclosures | Yes |
| DCPS 1-5 | DCPS Disclosures | Yes |
| | | |
| | | |
| | | |
| | * A detailed list of the documents disclosed is contained in the parties' disclosure notices | |

03/30/2005  14:44    20244255F    STUDENT HEARINGS    P    PAGE  17/18

In the Matter of MJ    DOB: 7/6/98   HOD: March 28, 2005

# MATTER OF  Mia Jeppsen V. DCPS

## RECORD OF PROCEEDING

| DATE | DESCRIPTION | |
|---|---|---|
| 10/20/04 | Request for Due Process | |
| | Notice of Pre-Hearing Conference (as applicable) | |
| 10/22/04 | Notice of Due Process Hearing | |
| | SETS Disposition Form | |
| | Transcripts or audio tapes of hearing | |

In the Matter of MJ   DOB: 7/6/98   HOD: March 28, 2005

# INDEX OF NAMES

## MATTER OF Mia Jeppsen V. DCPS

| | |
|---|---|
| Assistant Superintendent, Special Education (or Director) | Ms. Amy Roberts* |
| Special Education Teacher | |
| School Psychologist | |
| Regular Education Teacher | |
| Principal | |
| Speech/Language Therapist | Ms. Diane Hoffower *+ |
| | Ms. Kimberlee Pope *+ |
| Occupational Therapist | |
| Physical Therapist | |
| Private Psychologist | |
| Child and Child's DCPS ID # or SSN (insert ID # or Case Number on each page of the HOD vice child's name) | |
| Child's Parent(s) (specific relationship) | Ms. Carolyn Jeppsen, Mother * |
| | Mr. David Jeppsen, Father |
| Child/Parent's Representative | Ellen Douglas Dalton, Esq. |
| School System's Representative | Jack Schreibman, Esq. |
| DCPS Placement Coordinator | Ms. Pamela Owens * |
| Speech Pathologist | Ms. Mary O'Leary Kane +* |
| River School Special Education Teacher | Ms. Ramah Sundaramurthy |
| DCPS Hearing Impaired Program Supvsr. | Mr. John Schmidt +* |
| Audiologist | Ms.. Jennifer Mertes *+ |
| + Designated as an expert witness | |
| * testified in the hearing | |