wtk                                                                    1

T7180              GOVERNMENT OF THE DISTRICT OF COLUMBIA

                      DEPARTMENT OF PUBLIC SCHOOLS

                      OFFICE OF STUDENT HEARINGS

- - - - - - - - - - - - - x
                          :
In the Matter of:         :
                          :
MIA JEPPSEN               :
                          :
- - - - - - - - - - - - - x

                           Washington, D.C.

                           Monday, January 23, 2006

          The above-entitled matter came on for

hearing, pursuant to notice.

BEFORE:

          SY DuBOW, Hearing Officer

APPEARANCES:

     On Behalf of the Student/Parent:

          ELLEN DALTON, ESQ.


     On Behalf of D.C. Public Schools:

          RASHIDA CHAPMAN, ESQ.




          [TRANSCRIPT PREPARED FROM A TAPE RECORDING.]

wtk                                                                        2

## C O N T E N T S

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|
| Pamela Owens | 9 | 16 | 48 | 53 |

## E X H I B I T S

| STUDENT/PARENT | MARKED | ADMITTED |
|----------------|--------|----------|
| Nos. 1 through 26 | | |
| No. 27 | | |

D.C. PUBLIC SCHOOLS

Nos. 1 through

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C. 20003-2802
(202) 546-6666

wtk                                                              3

1                    P R O C E E D I N G S

2              HEARING OFFICER DuBOW:  Good morning,

3    we're on the Record.  Today is January 23, 2006,

4    this is an Administrative Hearing for Mia Jeppsen,

5    who was born on July 6, 1998.  I'll ask the parties

6    to introduce themselves for the Record, at this

7    time.

8              MS. CHAPMAN:  Good morning, Rashida

9    Chapman, Attorney Advisor, DCPS.

10             MR. SCHMITT:  John Schmitt [ph],

11   supervisor of the hearing impaired program for

12   DCPS.

13             MS. DALTON:  Good morning, Ellen Dalton,

14   counsel for the Parent.

15   attorney MS. JEPPSEN:  Carolyn [ph] Jeppsen, I am

16   the Parent.

17             HEARING OFFICER DuBOW:  This hearing is

18   being conducted pursuant to IDEA, the '97

19   amendments to IDEA and the 2004 Improvement Act, as

20   well as DCPS Regulations, to determine whether or

21   not DCPS acted in accordance with these applicable

22   laws with regard to Mia Jeppsen.

wtk                                                                    4

1              I'm Sy DuBow, an impartial Hearing

2       Officer.  I'm not an employee of DCPS, nor am I

3       related to nor a close acquaintance of the Student,

4       other than through the hearing process.  I am

5       prepared to hear both sides and act only on the

6       evidence presented.  Is the formal reading of

7       rights waived?

8              MS. DALTON:  Yes, sir.

9              HEARING OFFICER DuBOW:  The formal reading

10      of rights is waived and my determination will be

11      submitted within ten working days.

12             All matters discussed today are

13      confidential and this hearing is being recorded and

14      either party may request a copy by writing to the

15      Student Hearing Office.

16             As a preliminary matter, I have documents

17      labeled MJ-1 through 26, for the parent; they are

18      entered into the Record at this time; and I have

19      documents labeled DCPS-1 through 4, that are

20      entered into the Record at this time.

21                         [Parent's Exhibits Nos. MJ-1

22                           through MJ-26 admitted

 1                         into the record.]

 2                     [DCPS's Exhibits Nos. DCPS-1

 3                       through DCPS-4 admitted

 4                         into the record.]

 5          HEARING OFFICER DuBOW:  Any other

 6   preliminary matter?

 7          MS. CHAPMAN:  Yes, DCPS is making a motion

 8   right now requesting a continuance.  We had an

 9   emergency, I was informed this morning that my

10   special-education teacher, who is a necessary party

11   to this hearing had to go out of town this weekend

12   to assist an ailing family member.  She called

13   another witness and left a message saying that she

14   was en route to New York to--and she would not be

15   available.

16          I, personally, spoke to the teacher on

17   Friday at length and she was fully prepared to

18   testify at today's hearing.  And the fact that she

19   is not available now, certainly, causes great harm

20   and prejudice to DCPS.  As I said, she is a

21   necessary party and we are making this request

22   under the Blackman Consent Decree, which does

wtk                                                                          6

1   enable both parties one continuance.

2            HEARING OFFICER DuBOW:  No, it doesn't.

3   Only with due diligence.  You're not entitled to

4   automatic continuance, you have to show due

5   diligence.

6            MS. CHAPMAN:  Well--

7            HEARING OFFICER DuBOW:  What is your

8   position, Ms. Dalton?

9            MS. DALTON:  My position is, first of all,

10  I would object to--I'm not sure what the special-ed

11  teacher--I assume it's the hearing-impaired

12  teacher--could add to the case that Mr. Schmitt,

13  who is the director of the hearing impaired

14  program.  If she's merely going to describe the

15  program, Mr. Schmitt can describe the program at

16  Key School.

17           MS. CHAPMAN:  Well, one of the specific

18  allegations in the--one of the specific issues is

19  whether or not--that DCPS proposed placement can

20  implement the IEP and I think that the best person

21  to be able to testify to that and their ability to

22  implement the IEP would be the teacher.

1          MS. DALTON:  Mr. DuBow, Mr. Schmitt, we've

2    been to this hearing before, the issues are the

3    same as last November and Mr. Schmitt testified he

4    is the director of the hearing-impaired program,

5    obviously, he is in a position to know whether DCPS

6    can provide the services that are on the IEP.

7          MS. CHAPMAN:  If I may, the hearing before

8    was for a different school year.  And, so, now we

9    are talking about placement for the '05/'06 school

10   year.  And, again, I mean, our position whether or

11   not Dr. Schmitt is able to speak to the program,

12   our position, still, is that the best person and

13   the necessary person, as far as DCPS is concerned,

14   to be able to speak to the specific classroom that

15   we are proposing that the Student be place in is

16   the actual teacher that will be providing the

17   services and the educational benefit as mandated by

18   the Student's IEP.

19         HEARING OFFICER DuBOW:  Have you filed a

20   written request for a continuance with the Student

21   Hearing Office?

22         MS. CHAPMAN:  Since I just found this out,

wtk                                                                    8

1    no.  As soon as I found out the news, I came down

2    here.  I'm happy to do that, but, I mean, this is

3    not something I knew prior to 9:15.

4         HEARING OFFICER DuBOW:  Motion is denied.

5    Continue.

6         [Technical Interruption.]

7         HEARING OFFICER DuBOW:  This is the

8    Hearing Officer, Sy DuBow, I'm going to swear you

9    in at the present time.

10        Whereupon,

11                      PAMELA OWENS

12   was called as a witness and, having been first duly

13   sworn by the Hearing Officer was examined and

14   testified as follows:

15        HEARING OFFICER DuBOW:  Please state your

16   first name for the Record.

17        THE WITNESS:  [unintell.] Owens [ph].

18        HEARING OFFICER DuBOW:  What's your first

19   name?

20        THE WITNESS:  Pamela [ph].

21        HEARING OFFICER DuBOW:  And your position?

22        THE WITNESS:  Yes, it's Pamela,

1   P-a-m-e-l-a.

2            HEARING OFFICER DuBOW:  What is your

3   title, your position, what do you do?

4            THE WITNESS:  I'm the non-public

5   coordinator with D.C. Public Schools.

6            HEARING OFFICER DuBOW:  You're the what

7   coordinator?

8            THE WITNESS:  Non-public.

9            HEARING OFFICER DuBOW:  Oh, you're the

10  non-public coordinator.  If you have any trouble

11  hearing us let us know, okay?

12           THE WITNESS:  Okay.

13           HEARING OFFICER DuBOW:  Ms. Chapman will

14  ask you some questions to be followed by questions

15  by Ms. Dalton.  Are you ready?

16           THE WITNESS:  Yes.

17           HEARING OFFICER DuBOW:  Ms. Chapman.

18                   DIRECT EXAMINATION

19       BY MS. CHAPMAN:

20    Q   His, Ms. Owens, again, this is Rashida

21  Chapman, could you state your name one more time

22  for the Record, please?

wtk                                                                    10

    1        A     Pamela [unintell.] Owens.

    2        Q     Who are you employed by?

    3        A     D.C. Public Schools.

    4        Q     What is your position with D.C. Public

    5   Schools?

    6        A     I'm the non-public coordinator.

    7        Q     Can you describe for me what you do as the

    8   non-public coordinator?

    9        A     Well, I coordinate the activities of the

   10   non-public administrators.  I also attend meetings,

   11   assessments;, coordinate the activities of

   12   special-ed specialists; [unintell.] workshops.

   13        Q     When you said you attend meetings, what

   14   types of meetings do you attend?

   15        A     I attend IEP meetings and MDT.

   16        Q     Can you tell me if you are familiar with

   17   the Student Mia Jeppsen?

   18        A     Yes, I am.

   19        Q     How are you familiar with that Student?

   20        A     I attended a meeting the last [unintell.]

   21   for the last three years.

   22              HEARING OFFICER DuBOW:  I'm going to put

1   the volume up, I have a little static here.  Can

2   you hear us now?

3           THE WITNESS:  Yes.

4           HEARING OFFICER DuBOW:  Is that a little

5   better?

6           BY MS. CHAPMAN:

7       Q   Can you repeat what you just said, we had

8   trouble hearing you.

9           [Technical Interruption.]

10      A   I attended a meeting on Mia Jeppsen in '05

11  and also one [unintell.] two weeks.

12      Q   Can you tell me about the most-recent

13  meeting that you attended on behalf of this

14  Student?

15      A   Yes, it was on 9/12/05--a meeting was

16  scheduled to occur at D.C. Public Schools, however,

17  due to some complications, we agreed that they

18  could [unintell.] and they would meet at

19  [unintell.] at D.C. Public Schools.

20      Q   You said due to some complications.  What

21  complications?

22      A   Parent's attorney requested she said she

wtk                                                                    12

1   would not be able to come to D.C. Public Schools, I

2   don't know what the situation was.  She said it

3   would be difficult that she wanted to have it at

4   River school.

5        Q    When did you learn of those complications?

6        A    I think it was the day before the meeting.

7        Q    What was the purpose of the meeting on

8   9/12?

9        A    The purpose of the meeting on 9/12 was to

10  review the IEP and determine appropriate placement.

11       Q    Can you tell me what happened, then, at

12  that meeting?

13       A    We reviewed the IEP at her current level

14  of functioning; we determined what her basic needs

15  were, educational needs, and what types of related

16  services she would need.  The IEP was [unintell.]

17  that and we determined that she needed a less

18  restricted environment.

19       Q    In going back and reviewing--you said that

20  you reviewed the IEP, do you recall any of the

21  discussion surrounding the revision or review of

22  the IEP?

1      A    Yes, I recall the fact that we talked

2   about her--the related services she would need.

3   How many hours she would need--that the River

4   school did not have an  FM [ph] system there and

5   she needed that.   We determined that she should be

6   placed in a setting that would provide her with all

7   the resources.

8      Q    Do you recall who was present at that

9   meeting?

10      A    Well, I was present; John Schmitt was

11   there, Laurie O'Leary Cane [ph] Mia's mother and

12   the teacher and audiologist.

13      Q    Do you recall if there were significant

14   changes from the prior IEP to the one that you all

15   revised on 9/12?

16      A    Specific changes--no there were no

17   specific changes.   The fact was that she still

18   wasn't receiving some of the services she needed

19   and because she has a hearing impairment, we felt

20   that she should be tutored by a person who

21   specializes in working with students who are

22   hearing impaired.   And they didn't have that at the

1   River School, they also didn't have the FM  system,

2   so there were some certain, we really talked about

3   what was the least restrictive environment, what

4   her needs were--what she needed to be successful

5   and to help her to develop skills.

6        Q    Do you recall what your thoughts were or

7   do you recall the discussion, specifically,

8   surrounding her placement?

9        A    There was a discussion surrounding

10  placement?

11       Q    Yes.

12       A    Well, we discussed what her basic needs

13  were; her related services.  She would--we talked

14  about she would benefit in working with functioning

15  students, however she [unintell.] she was told that

16  she could move out of this specialized setting so

17  that she could be placed into the mainstream and

18  she had not yet developed those skills yet.

19            So, we talked about placing her in a

20  setting with--specialized in working with people

21  who are hearing impaired so that she could develop

22  the skills and be able to work on grade level--her

1   appropriate grade level, because right now, she's

2   working in a class where students are younger than

3   she is and we felt that if she could receive the

4   services that she would be better served.

5       Q    What was the--

6       A    We talked about moving her into two

7   schools, a school for hearing-impaired students who

8   have hearing impaired teachers and they have all

9   related services.  She would be placed in a school

10  setting that is--where she could go out and receive

11  other services when she becomes--when she's ready

12  to go out and receive other services, the

13  mainstream students and the different areas that

14  are most appropriate for that student.  However,

15  they make sure that they receive all the basic

16  services that's in their environment.

17      Q    Do you recall what the discussion was

18  about the Key School?  I mean, I know you just

19  described the program, but was there any discussion

20  beyond that about the Key School at the meeting?

21      A    Yes, we did discuss the Key School.  We

22  talked about the Key School.  We stated that the

1  Key School was a program for hearing-impaired

2  students; they do mainstream students into the

3  setting, as appropriate.  They do have all related

4  services and she will receive--she will also

5  receive speech-and-language therapy.

6       Q    Was there--let me ask you this questions:

7  Was there anything else that you all discussed at

8  the meeting besides the IEP and placement?

9       A    Was there anything else we discussed at

10 the IEP?

11      Q    At the meeting on 9/12?

12      A    The IEP and placement, we discussed

13 that--those were the only two things we discussed

14 at that meeting.

15      Q    How did the meeting conclude?

16      A    How did it conclude?

17      Q    Yes.

18      A    Well, we offered a placement at Key

19 Elementary School--we proposed a placement at Key

20 Elementary School.

21           MS. CHAPMAN:  Thank you, no further

22 questions for this witness.

HEARING OFFICER DuBOW: Ms. Dalton.

CROSS-EXAMINATION

BY MS. DALTON:

Q Ms. Owens, can you hear me?

A Yes, I can.

Q Isn't it true that you knew five days before the meeting that the meeting was going to occur at the River School and at that time you informed me that you would not be present in person and would participate by phone?

A No.

Q Well, I'm going to--you're not here, so unfortunately, I can't show you this document. But as rebuttal purposes and impeachment purposes, I'm going to ask the Hearing Officer to accept a letter dated September 8, which was faxed to you with a confirmation which indicates that, Dear Ms. [unintell.] Owens, this is to confirm our telephone conversation in which we agreed that the MDT/IEP meeting for Mia would take place on September 12 at 10:00 a.m. at the River School.

You indicated that you would not be able

1    to be present in person and would participate via

2    the telephone.

3          MS. CHAPMAN:  I'm going to object to this

4    document.  It's from, I don't see it on the--

5          MS. DALTON:  It's an impeachment, she's

6    testified that she didn't know until the morning

7    of.

8          MS. CHAPMAN:  Well, I'm still objecting on

9    the basis that we have--

10         HEARING OFFICER DuBOW:  Overruled, the

11   document's in.

12                      [Parent's Exhibit No. 27,

13                      admitted.]

14         THE WITNESS:  I didn't know till the day

15   before.

16         BY MS. DALTON:

17   Q    In any even, you knew five days before.

18   A    No.

19   Q    Ms. [unintell.] Owens, you indicated that

20   the River School does not have an FM system?

21   A    Right.

22   Q    In your notes, which are--

1      A    That was explained to me at the meeting.

2      Q    --in your notes, which are DCPS No. 1,

3  those are the meeting notes that you took at the

4  time of the meeting on September 12, '05.  And on

5  Page--again, I apologize you're not here in person,

6  but your attorney can look at this--on Page 4

7  of--I'm sorry--Page 6 of the meeting notes--

8           HEARING OFFICER DuBOW:  What--one second--

9           MS. DALTON:  It's document No. 1 of DCPS--

10          HEARING OFFICER DuBOW:  I got it.  I got

11  yours, the same one.

12          MS. DALTON:  No, their--ours are

13  typewritten, theirs are handwritten.  They are two

14  different meeting notes.

15          HEARING OFFICER DuBOW:  Oh.

16          BY MS. DALTON:

17     Q    So, it's document No. 1 and you have to

18  count back pages because they're not all numbered.

19  It's actually the last page of Document No.

20  1--starts out with Parent Attorney--

21          HEARING OFFICER DuBOW:  I have it.

22          BY MS. DALTON:

wtk

1    Q    --okay.  Doesn't it indicate there that

2  River School does have an FM system that Mia has

3  been able to utilize?  Isn't that correct, Ms.

4  [unintell.] Owens?

5    A    I'm--no I don't know anything about River

6  School having an FM system.  I know the River

7  School always asked DCPS to provide the FM system.

8  However, if River School had the FM system, why are

9  they always asking DCPS to provide that to them if

10  they're prepared to teach children with hearing

11  impairment?

12    Q    Isn't it correct that the River School has

13  been loaning Mia one even though DCPS is

14  required--since DCPS has placed her in the past, to

15  provide what is on her IEP and an FM system is on

16  her IEP?  And don't you recall the conversation

17  that you indicated that DCPS would provide an FM

18  system?

19    A    Yes, I do recall the conversation where I

20  said DCPS would try to provide an FM system.

21  However, River School had always said that they did

22  not have one.

1       Q    Well, then, why did you write in your

2  notes that River School does have an FM system that

3  Mia has been able to utilize?

4       A    Was it in the notes?

5       Q    It is?  Could you be--

6       A    I don't have the notes in front of me.

7       Q    Maybe you're just not remembering

8  correctly?

9       A    I [unintell.] that River School does not

10  have an FM system and they wanted DCPS to provide

11  them with one.

12       Q    Let me ask you, again--you testified

13  earlier that you talked about the LRE, the

14  least-restrictive environment at this meeting,

15  which is the September 12, '05 meeting, correct?

16       A    Excuse me?

17       Q    You testified earlier that at the

18  September 12, '05 meeting, you discussed the

19  least-restrictive environment for  Mia?

20       A    Yes.

21       Q    Isn't it true that on that same page,

22  which is the last page of your meeting notes, it

wtk                                                                    22

1    talks about the least-restrictive environment; Mia

2    needs a general-ed setting with resource and

3    specialized instruction?  So, isn't it true--

4              HEARING OFFICER DuBOW:  One second, that's

5    that same page?

6              MS. DALTON:  Yes, toward the end of that

7    box.

8              MS. CHAPMAN:  Which--

9              MS. DALTON:  It says the IEP Will be sent

10   to DCPS, Page 6, the last page of the meeting

11   notes.  And then it says Mia needs--

12             HEARING OFFICER DuBOW:  Wait, which--your

13   notes?  Your document?

14             MS. DALTON:  No, her notes, Document No. 1

15   of DCPS's.

16             HEARING OFFICER DuBOW:  Okay.

17             THE WITNESS:  What page?

18             HEARING OFFICER DuBOW:  Okay, I have it.

19             BY MS. DALTON:

20        Q    Do you have your meeting notes, Ms.

21   [unintell.] Owens?

22        A    Yes, I have them here.

wtk                                                                    23

1       Q    It's the last page of your meeting notes,

2   it says Mia needs a general-ed setting with

3   resource and specialized instruction.  Do you have

4   your notes?

5       A    What page did you say it's on?

6       Q    Page, well, I counted six, it's the last

7   page of your meeting notes.

8       A    I says Mia [unintell.] students?

9       Q    That's another place, thank you for

10  pointing that out.

11           HEARING OFFICER DuBOW:  Where's that?

12           THE WITNESS:  It says--

13           BY MS. DALTON:

14      Q    It's on the page before, Mia benefits from

15  working in the LRE, least-restrictive environment,

16  with typically functioning students.

17      A    Right.

18      Q    That's regular-ed students, correct?

19  Typically functioning means regular-education

20  students?

21      A    All age groups--that's basically--I know

22  Mia's in a setting where students are younger than

wtk

1   she is.

2       Q    Mia's in a setting with regular-education

3   students, correct?  Currently at the River School?

4       A    Younger than she is, she is not in the

5   correct age group.

6       Q    Ms. [unintell.] Owens, my question to

7   you--the class that Mia's in is comprised--the

8   majority of the students are regular-ed students at

9   the River School, correct?

10      A    Some of them are, some of them are

11  speech-and-language impaired.  Most of them are

12  speech-and-language impaired.

13      Q    Did you hear my question?  I said a

14  majority--do you know how many students are in that

15  class--

16       MS. CHAPMAN:  Objection, this is getting

17  argumentative, she's answered the question.

18       HEARING OFFICER DuBOW:  Well, she's not

19  answering the question, so--

20       MS. CHAPMAN:  She did answer--

21       HEARING OFFICER DuBOW:  Repeat the

22  question and I'll ask the witness to answer only

1    the question asked.

2            BY MS. DALTON:

3        Q    Ms. [unintell.] Owens, isn't it correct

4    that at the River School Mia's in a class where the

5    majority of the students are regular-ed students?

6        A    No.

7        Q    How many students--

8            HEARING OFFICER DuBOW:  What was that

9    answer, no?

10            THE WITNESS:  No, as far as I know most of

11    the students are speech-and-language impaired.

12            HEARING OFFICER DuBOW:  So, your testimony

13    is that the students at River School where she is

14    now, most of the students are speech-and-language

15    impaired, is that correct?

16            THE WITNESS:  Yes, they're

17    speech-and-language impaired, those are students

18    who are younger than Mia.  She's in an age group

19    where the students are younger than she is and

20    they're speech-and-language impaired.

21            BY MS. DALTON:

22        Q    Ms. Owens, how many students are in the

26

1    classroom where Mia's currently at at the River

2    School?

3         A    [unintell.]--

4         Q    I'm must asking from your own--

5         A    --how many school--how many students?

6         Q    --from your own recollection?

7         A    From my own recollection?  I think eight

8    to ten, I'm not sure.

9         Q    How many students have a hearing

10   impairment that are in that class?

11        A    Hearing impairment, maybe one, I'm not

12   sure.

13        Q    Okay.

14        A    But the school serves the students who are

15   speech-and-language impaired.

16        Q    Now, the IEP that was developed on

17   September 12, '05, when you were participating by

18   phone, correct?  Ms. [unintell.] Owens.  Ms. Owens?

19   Ms. Owens?  This is ridiculous.

20             HEARING OFFICER DuBOW:  Are you still

21   there--Ms. Owens are you still there?

22             THE WITNESS:  Hello?

1          HEARING OFFICER DuBOW:  Can you hear us?

2          THE WITNESS:  Hello?

3          HEARING OFFICER DuBOW:  Can you hear us?

4          THE WITNESS:  Hello?

5          HEARING OFFICER DuBOW:  Can you hear us?

6          THE WITNESS:  Yes, I can.

7          HEARING OFFICER DuBOW:  Okay, we'll repeat

8    the question.

9          BY MS. DALTON:

10    Q    Ms. Owens, do you--the IEP that was

11    developed on September 12, '05, correct, when you

12    participated by phone?

13    A    Yes.

14    Q    You received a copy of--

15          HEARING OFFICER DuBOW:  One second--one

16    second, Ms. Owens are you outside or where are you?

17          THE WITNESS:  Right now, I am walking to

18    my car.

19          HEARING OFFICER DuBOW:  Okay, can you--why

20    don't we just--how far are you from--you're on a

21    cell phone?

22          THE WITNESS:  Yes.

wtk                                                                    28

1                HEARING OFFICER DuBOW:  All right, can you

2    get in--are you close to your car?

3                THE WITNESS:  Yes, I am.

4                HEARING OFFICER DuBOW:  All right, once

5    you get in, then we'll resume because there's too

6    much background noise and you're coming in and out.

7                THE WITNESS:  Okay.  Hello?

8                HEARING OFFICER DuBOW:  Okay, can you hear

9    us now?

10               THE WITNESS:  Yes.

11               HEARING OFFICER DuBOW:  You're in your

12   car?

13               THE WITNESS:  Yes.

14               HEARING OFFICER DuBOW:  All right.  Can

15   you hear her, Ms. Dalton?

16               MS. DALTON:  Yes, I can, thank you.

17               HEARING OFFICER DuBOW:  Go ahead, Ms.

18   Dalton.

19               BY MS. DALTON:

20       Q    Ms. Owens, the IEP that was developed on

21   September 12, '05, when you were participating by

22   phone--you received a copy of that IEP subsequently

1   correct?

2        A    Yes.

3        Q    DCPS, after receipt of that IEP, issued a

4   Notice of Placement which is dated November 2, '05?

5        A    Yes.

6             HEARING OFFICER DuBOW:   Which document is

7   that?

8             MS. DALTON:   That's DCPS's Document No. 3.

9   I think it's also in the Parent's document, but

10  it's Parent's Document No. 21 and DCPS's Document

11  No. 3.

12            BY MS. DALTON:

13       Q    Now, the Notice of Placement that was

14  issued almost two months later indicated that her

15  placement was to be in a setting out of

16  general-education, is that correct?

17       A    Yes, that was discussed at the meeting.

18       Q    Ms. [unintell.] Owens, the IEP that was

19  developed on September 12 for which this Notice of

20  Placement was issued does not call for Mia to be in

21  an out-of-general-education setting, does it?

22       A    The IEP, yes it does.   It says 25.5 hours

1   a week of specialized instruction in

2   speech-and-language therapy.  That is actually 25.5

3   hours a week, that's out of general education.

4       Q   Ms. [unintell.] Owens, the setting that is

5   marked there is general-ed setting, correct, for

6   the 25.5 hours?

7       A   Oh, yes, that's general-ed setting.

8           HEARING OFFICER DuBOW:  One second, that's

9   Document No.

10          MS. DALTON:  My No. 18, under setting it

11  says the 25.5 are in a general-ed setting.

12          BY MS. DALTON:

13      Q   The only specialized instruction--

14          HEARING OFFICER DuBOW:  One second.

15          MS. DALTON:  --I'm sorry.

16          HEARING OFFICER DuBOW:  This IEP's a

17  little different.

18          MS. DALTON:  Also on Page 4 of 4, it talks

19  about the setting.

20          HEARING OFFICER DuBOW:  --yeah that's what

21  I was looking at.

22          MS. DALTON:  It should be right after that

1    page, yeah.

2              HEARING OFFICER DuBOW:  Yeah, got it.

3              BY MS. DALTON:

4        Q    Ms. [unintell.] Owens, if you look at Page

5    4 of 4, if you have the IEP, where it says,

6    describe placement considerations?  It says out of

7    general education rejected.  Combination

8    general/special-education rejected.  General

9    education with support as described in this IEP

10   accepted, isn't that correct?

11       A    That's what you wrote down there, yes.

12       Q    That's the IEP from which DCPS issued the

13   Notice of Placement, Ms. Owens--

14       A    Yeah, we--

15       Q    --you participated in this IEP--

16       A    [unintell.] -- however that's what you

17   wrote.

18       Q    It's not what I wrote--

19       A    The Student need I just said here

20   specialized instruction for 24--25.5 hours a day

21   [sic] they cannot receive specialized instruction

22   in a general-ed students that are a year younger

1    than they are, that's not an appropriate setting

2    for that Student.

3        Q    Ms. Owens, have you ever heard of

4    inclusion?

5        A    Yes, I have.

6        Q    Okay, Ms. Owens, isn't it true on the

7    front page of the IEP, it says amount of

8    specialized services is six percent?  That's the

9    time that she's out of general education?  Isn't it

10   correct, the only time on this IEP that she's

11   supposed to be out of the general-education setting

12   is for the pull-out speech-and-language and the

13   pull-out audiology?

14       A    That's what's on the IEP.

15       Q    This IEP is what you sent the Notice of

16   Placement on.

17       A    We didn't write this IEP, you sent this

18   IEP over to D.C. Public Schools.

19       Q    You didn't develop any other IEP and you

20   asked for them to fax this--to forward this IEP to

21   you, isn't that true?

22            MS. CHAPMAN:  Objection, argumentative?

wtk                                                                      33

1          THE WITNESS:  [unintell.]

2          HEARING OFFICER DuBOW:  Wait, wait--I

3    think, it's a legitimate question, but I'd allow

4    the witness to answer and then go ahead.  So, let's

5    repeat, Ms. Dalton, ask the question and, all

6    right, one question at a time, and then we'll try

7    to get one answer at a time.

8          BY MS. DALTON:

9      Q    Ms. Owens, isn't it true that the Notice of

10   Placement that was issued in November was issued

11   from the September 12, '05, IEP?

12     A    From the meeting, yes.

13     Q    And based on the IEP that was developed at

14   that meeting?

15     A    Yes.

16     Q    You knew that the River School people who

17   had a speech-and-language--you knew the River

18   School was developing the IEP with your

19   participation?

20     A    Right, but the River School could not

21   change--meet those changes that they did to say

22   that the Student only received specialized

1    instructions in the general-ed setting.

2         Q    Ms. Owens, isn't it true that they read--

3         A    -- [unintell.] when you're placing a child

4    in a group of children who are younger than she is,

5    that's really not a restrictive environment.

6         Q    Ms. Owens?

7         A    You're putting her back every--

8         Q    Ms. Owens, isn't it true that you

9    participated in the phone conference--

10        A    Yes, I did.

11        Q    --when the IEP was developed?

12        A    Yes, I did.

13        Q    Who else from DCPS was present?

14        A    John Schmitt.

15        Q    You didn't have an audiologist?  You

16   didn't have a speech-and-language pathologist?  You

17   didn't have a regular-ed teacher?  Am I correct?

18        A    No, we didn't.

19        Q    You were relying on the River School team,

20   correct?

21        A    They were on the River School team, yes.

22        Q    You directed them and told them to develop

wtk

1   the IEP, isn't that correct?

2       A    Yeah, we could have developed the IEP

3   together, however, we were trying to get

4   [unintell.] at the River School.  However, you did

5   agree to come to DCPS and hold the meeting.

6       Q    When you received this IEP, Ms.

7   [unintell.] Owens, did you ever indicate that you

8   were not in agreement with the IEP?

9       A    By the time you sent the IEP, I had gone

10  out on leave, my mother passed away and I was out

11  on leave.

12      Q    Did you, at any time since September 12,

13  ever indicate that you were not in agreement with

14  this IEP?

15      A    Since September 12?

16      Q    That's the date it was written.

17      A    Yeah, after I received the IEP, I never

18  called and said I disagreed with it, no.  However

19  we did send the Notice of Placement.

20      Q    Isn't it true that the--during the

21  meeting, you were read about her needing to be in a

22  regular-education classroom, that that was on the

1   IEP, isn't that correct?

2       A    During the meeting did we talk about did

3   she need to be in the regular-ed classroom?  Yes,

4   we did.

5       Q    Isn't it true that Ms. O'Leary-Cane [ph]

6   read aloud the front page of the IEP to you?

7       A    No.

8       Q    So you're disputing the fact that the

9   meeting notes that were taken by Ms. O'Leary Cane

10  in which she indicates she read aloud the related

11  service summary on the front page of the IEP and

12  indicating Mia requires combined

13  specialized-instruction and speech-and-language

14  therapy for 25.5 hours a week, provided by a

15  special-educator and a speech pathologist, in the

16  general-education setting?

17      A    We didn't hear it.  I think you must have

18  hung up by that time.  The last thing we talked

19  about was her placement.

20      Q    This is before the placement, actually,

21  it's Page 4 of the meeting notes, which you also

22  received from the River School.  Page 4 of the River

1    notes and it's Document No. 19, for your reference,

2    Ms. Chapman, 19 of the Parent's documents, Page 4.

3            MS. CHAPMAN:    Okay.

4            THE WITNESS:    The meeting notes, the River

5    School meeting notes, I don't have the River

6    meeting notes.

7            BY MS. DALTON:

8    Q    And isn't it true that with regard to the

9    placement discussion--when there was a placement

10   discussion, there was no description of the key

11   program at that IEP meeting?

12   A    Yes, there was a description of the key

13   program, John Schmitt was there and he gave a

14   description of the program.

15   Q    Where is that reflected in your meeting

16   notes?

17   A    There--we talked about the placement notes

18   because Mia was placed in a setting that provided

19   FM that school year, however, Parent and attorney

20   [unintell.]--

21   Q    Isn't it true that the many times you were

22   asked to explain why the Key School was appropriate

38

1   that both you and Mr. Schmitt kept indicating that

2   it was just appropriate and that was the reason you

3   were proposing the Key School?

4       A    That what was appropriate?  It was

5   appropriate?

6       Q    Right, wasn't that your response, every

7   time you were asked to explain how it was

8   appropriate, that you just responded, it's

9   appropriate?

10      A    We said it was appropriate because it

11  provided Mia with [unintell.] teachers all her

12  generalized-- [unintell.] service--she could also

13  receive general-education services as she is

14  mainstream and she will receive specialized

15  instruction from a hearing-impaired teacher.

16      Q    Where is that in your meeting notes?

17      A    Where is it in the meeting notes?

18      Q    Mm-hmm.

19      A    It's at--we jus stated--I don't think I

20  even wrote it in the meeting notes, because we had

21  already talked about it in the last two meetings.

22      Q    Isn't it true that you indicated nothing

1  had changed about the Key School from the last

2  hearing that we had?

3      A    Did I say nothing changed about the Key

4  School?

5      Q    Isn't it true that you indicated nothing

6  had changed about the program at the Key School

7  from the time that we had the last hearing?

8      A    Yes, that's true.

9      Q    The last hearing, the decision was

10 rendered in March and since that time--at that time

11 the Hearing--isn't it true that the Hearing Officer

12 found that DCPS had not sustained their burden in

13 proving that Key School was an appropriate

14 placement for Mia?

15         MS. CHAPMAN:  Objection, to that question.

16         HEARING OFFICER DuBOW:  If she knows--if

17 she knows, fine, if she doesn't know, that's fine.

18         BY MS. DALTON:

19     Q    Are you aware of the decision, Ms.

20 [unintell.]--

21     A    I don't have the HOD in front of me right

22 now.

1       Q    Okay.  Are you aware--do you understand

2   that that HOD indicated that DCPS had not met its

3   burden in proving that Key School was an

4   appropriate placement for Mia?

5       A    Is that what it says?  I know I don't have

6   it in front of me.

7       Q    Oh, I thought you said you had it in front

8   of you, I'm sorry.  What was your understanding?

9   You testified at the last hearing, correct?

10      A    Yes.

11      Q    You understand that Mia's still at the

12  River School, correct?

13      A    Yes, I understand that.

14      Q    Did you understand that the Hearing

15  Officer ruled that DCPS had not proven that Key was

16  an appropriate program for Mia?

17      A    I don't think he said that it wasn't

18  appropriate.  I think that he stated that we need

19  to hold another meeting.

20      Q    That was your understanding of the HOD?

21      A    Yes, hold another meeting and complete a

22  placement.

1      Q    Maybe that's the problem.  Let me ask you,

2   looking at the IEP--do you have a copy of the IEP

3   in front of you?

4      A    Yes.

5      Q    If you can take a look at the IEP, line

6   No. 18, Parent's No. 18, if you could look at the

7   page that has related services on it, which is Page

8   4 of 4.

9      A    Mm-hmm.

10      Q    Give me just a minute, I'm trying to get

11   to it.  Under supplementary aids and services and

12   classroom needs, which is about half-way down the

13   page, do you see that part?

14          HEARING OFFICER DuBOW:  I'm sorry.  I've

15   got it, thank you.

16          BY MS. DALTON:

17      Q    Page 4 of 4, where it says supplementary

18   aids and services?

19      A    Okay.

20      Q    Did you find that page?

21      A    Yes.

22      Q    On that page, where it says supplementary

1    aids and services, it requires a related or an aid

2    to be mapping of the cochlear implant--does the Key

3    School have the computer and programming necessary

4    to map a cochlear implant?

5         A    I don't have that information right now on

6    Key School, however, John Schmitt [unintell.]

7         Q    But you are the one that sent the Notice

8    of placement, correct?

9         A    Right.

10        Q    And you are the placement specialist?

11        A    No, I'm the non-public coordinator.

12        Q    You proposed Key at the IEP--

13        A    Yes.

14        Q    --meeting that we had--

15        A    Yes.

16        Q    --as being appropriate?  And you knew at

17   that time, that mapping was a necessary service

18   that would need to be provided to Mia?  So, are you

19   saying that you issued a Notice of Placement

20   without knowing whether Key could provide that

21   service?

22        A    You'd have to ask John Schmitt about those

1    services, he was there, also,a that the meeting.

2        Q    Isn't it also true under the

3    least-restrictive environment on that same page,

4    just above, it says, general-education class with

5    specialized instruction and services?

6        A    Yeah, I see that--I see the whole IEP, I

7    saw that.

8        Q    Isn't it true, also, Ms. Owens, that you

9    testified earlier you observed Mia in 2003?

10       A    Yes.

11       Q    The only observations you've made of Mia

12   are in brief passing, isn't that correct?

13       A    Right, I only gave brief observations, we

14   had others to come in and observe Mia.  My

15   observations were brief, however, we had

16   audiologists and hearing-impaired teachers and also

17   John Schmitt came in to do the observations.

18       Q    John Schmitt never observed Mia Jeppsen

19   did he?

20       A    No, there were other people came in to

21   observe Mia Jeppsen.  I don't know exactly who,

22   however, we all know that that did happen.

1            HEARING OFFICER DuBOW:  Is that '03?  Did

2    she say she made a brief observation in '03?

3            MS. DALTON:  In '03.  And that--

4            THE WITNESS:  That was before they came in

5    to observe--the last school year.

6            HEARING OFFICER DuBOW:  I'm not

7    asking--wait.  You testified you made a brief

8    observation in '03?

9            THE WITNESS:  Yes.

10           HEARING OFFICER DuBOW:  In '03, I just

11   want to know I got the right year, in '03?

12           THE WITNESS:  Yes, that's correct, in '03,

13   I did a brief observation.

14           HEARING OFFICER DuBOW:  When you say,

15   brief, you mean a few minutes?

16           THE WITNESS:  Like, five minutes,

17   something like that.

18           HEARING OFFICER DuBOW:  All right, your

19   witness.

20           BY MS. DALTON:

21      Q   Then, with regard to--you mentioned that

22   other people from DCPS had observed Mia?

1       A    Right.

2       Q    Do you know specifically who?

3            MS. CHAPMAN:  I'm going to object to the

4  relevance as to this, if we're talking about the

5  '03/'04 school year, I mean.

6            MS. DALTON:  I'm getting to it--it's not

7  the '03/'04, I'm just trying to ask her who it was,

8  first.

9            THE WITNESS:  I'm not sure, I think it

10 might be--

11           MS. CHAPMAN:  My objection still--

12           THE WITNESS:  --it could have been--

13           HEARING OFFICER DuBOW:  You're not sure,

14 are you?

15           THE WITNESS:  I'm not really sure

16 [unintell.] audiologist and, also, we had a

17 hearing-impaired teacher that came in last school

18 year to observe.

19           BY MS. DALTON:

20      Q    The observations that you're referring to,

21 though, happened prior--they happened in the '04

22 school year--

wtk                                                                    46

1        A    Yes.

2        Q    --and prior to the last hearing, isn't

3    that correct?

4        A    Yes.

5        Q    No one has observed Mia at the River

6    School, since the last hearing?

7        A    Right.

8        Q    DCPS has never done any evaluations of

9    their own on Mia, isn't that correct?

10       A    I'm sure we did evaluations on Mia, I just

11   don't have them in front of me.

12       Q    Why are you sure of that?

13       A    Because Mia is in special-education and,

14   usually, we order the evaluations to make a Student

15   eligible for special-education.

16       Q    When you say, we usually, are you sure

17   that they have ever evaluated Mia?

18       A    Yes, I'm pretty sure Mia came there with

19   evaluations from D.C. Public Schools.

20       Q    Mia's been at the River School since 2000,

21   isn't that correct?

22       A    Since when?

1      Q    Since 2000?

2      A    I don't have her--I don't have that

3   information in front of me.

4      Q    Isn't it correct that DCPS funded and

5   placed her at the River School until--never

6   proposed a different placement until 2004?

7      A    That's correct.

8          MS. CHAPMAN:  Objection--I'm objecting,

9   again, as to the relevance to the issue that we're

10  here to--

11         HEARING OFFICER DuBOW:  Well, she is the

12  non-public--that's her job, so she would know

13  whether they placed or not.  I think it's

14  allowable, I'll allow it.

15         MS. DALTON:  She answered the question.

16         HEARING OFFICER DuBOW:  Within her

17  knowledge, she said, yes, right?

18         MS. DALTON:  Correct.

19         THE WITNESS:  Because we didn't have--we

20  developed the program for students like Mia.

21         BY MS. DALTON:

22     Q    And that was in 2004?

wtk                                                                      48

1          A     2003 because that was the program for Mia.

2          Q     But the first time you proposed a

3     different placement for Mia was in 2004?

4          A     Right.

5          Q     That was at the Key School?

6          A     Yes, it's a brand-new program--it's a

7     wonderful program.

8          Q     You testified at the hearing previously in

9     March of '04, correct?  March of '05, I'm sorry,

10    March of '05, correct?

11         A     Correct.

12              MS. DALTON:  I have no further questions.

13              HEARING OFFICER DuBOW:  Redirect.

14              MS. CHAPMAN:  Just a few questions for

15    you, Ms. Owens.

16                    REDIRECT EXAMINATION

17              BY MS. CHAPMAN:

18         Q     If you could turn to Page 5 of the 9/12

19    meeting notes.

20              MS. DALTON:  Are they her meeting notes?

21              BY MS. CHAPMAN:

22         Q     Of DCPS'--thank you, DCPS' meeting notes,

wtk

1    which is DCPS-01.

2        A    Okay, what exhibit us it?

3        Q    It is the fifth page, so it's the

4    second-to-the-last page of actual notes?

5        A    Yes.

6        Q    If you look down at the bottom, the

7    second-to-the-last sentence, if you could read that

8    sentence, please, starting with Mia still--

9        A    It's says Page 4 on it?

10       Q    It's the page after the one that says Page

11   4.

12       A    Okay.  Mia--the second-to-last sentence?

13       Q    Yes, please.  It starts with Mia still--

14       A    Okay, Mia, has--Mia still?

15       Q    Yes.

16       A    This says Mia has--guess I'm on the

17   wrong--oh, it starts with what?

18       Q    Mia still

19       A    [unintell.]

20           HEARING OFFICER DuBOW:  All right, rather

21   than keep going through the notes, there's obvious

22   conflict here.  The notes on Page 4 say Mia still

wtk

1  needs an FM system that River School does not have

2  the system.  Then it says, Mia was placed in a

3  setting that provided the FM last school year.

4  Okay, and then you got, later on, on the end of

5  Page 5, which we have already covered, saying that

6  that's River School does have an FM system.

7          BY MS. CHAPMAN:

8      Q   So, can you tell me if the sentence on Page

9  5, which states that Mia still needs an FM system,

10  if that is in conjunction with what your own

11  thoughts were as to whether or not the River School

12  had an FM system?

13     A   Yes, that was my understanding.  The River

14  School was--I was writing down what they were

15  telling me.  They said she still needs an FM system

16  and they did not have one and they were asking when

17  they could receive one.

18     Q   Is it your understanding--let me ask you:

19  What is your understanding as to the amount of

20  hours on an IEP that would render a Student

21  receiving full-time special-education?

22     A   The amount of hours that they would need

1    specialized education--full time, that would be

2    27.5 hours.

3        Q    Do you recall what the amount of hours was

4    on the prior IEP, the one that was developed before

5    the September 12, meeting?

6        A    I'm sure it was 27.5 hours because she's

7    always needed a full-time setting.

8        Q    Do you recall if the last IEP--first, let

9    me ask you this:  Do you recall who prepared the

10   last IEP?

11       A    In November?

12       Q    Yes.

13       A    I did, I did.

14       Q    Do you recall the amount of time that the

15   IEP allotted for her not to be in regular

16   education?

17       A    Not to be in regular education?

18       Q    Right, which is DCPS-04.

19       A    Ninety-eight percent of the time she would

20   be in specialized instruction.

21       Q    You said 98 percent of the time

22   specialized instruction?

1        A    Right.

2        Q    Do you recall if the amount of hours,

3    specialized instruction, as well as related

4    services, do you recall if those hours decreased or

5    increased on the 9/12 IEP?

6        A    They stayed the same.

7        Q    They stayed the same?

8        A    Yes.

9        Q    Okay.

10        A    Related services, specialized instruction

11    stayed the same.

12        Q    Hypothetically, can you just imagine, if

13    you were the one that was drafting the most-recent

14    IEP with the hours of specialized instruction and

15    related services staying the same, what would the

16    amount of time in specialized instruction be?

17        A    Ninety-eight percent of the time she would

18    be in specialized instruction.

19        Q    Do you have any thoughts as to why the

20    River School would draft an IEP with identical

21    amounts of hours or close to identical amount of

22    hours in specialized instruction, but change the

1   amount of time in specialized instruction?

2       A    Yes, River School is a [unintell.] school

3   they want to teach another Student in their school,

4   so they wrote it a way to suit their needs so the

5   Student would remain there.

6           MS. CHAPMAN:  Thank you, no further

7   questions.

8           HEARING OFFICER DuBOW:  Any recross?

9           MS. DALTON:  Just a follow-up.

10                  RECROSS-EXAMINATION

11          BY MS. DALTON:

12      Q    Isn't it true Ms. [unintell.] Owens that

13  there were, actually two IEPs drafted in the '04

14  school year--the ones dated November 17, '04?

15  One--

16      A    No, there was only one drafted.  I think,

17  maybe, you drafted one after the meeting, but that

18  was not--we didn't really get a copy of that.

19      Q    Isn't it true that both IEPs were in the

20  last hearing?

21      A    Yes, the Hearing Officer said that our IEP

22  was the correct one.d

54

1        Q    That's your recollection?

2        A    Yes.

3             MS. DALTON:  I guess that's why the left

4   her at the River School.

5             HEARING OFFICER DuBOW:  What are the

6   documents--excuse me, what are the two documents?

7   I have DCPS-4, which is the 11/17/04, IEP that she

8   referred to?

9             MS. DALTON:  Right.

10            HEARING OFFICER DuBOW:  Where's the other

11  one that you referred to?

12            MS. DALTON:  MJ-13.

13            HEARING OFFICER DuBOW:  MJ-13?

14            MS. DALTON:  That's the Parent's documents

15  and that was the IEP drafted by the River School on

16  the same date, November 17.  And at the last

17  hearing, both of those IEPs were put into the

18  hearing.

19            HEARING OFFICER DuBOW:  All right, let me

20  juste, one second.  Anything further?

21            MS. DALTON:  Yes.

22            BY MS. DALTON:

1      Q    Ms. [unintell.] Owens, isn't it true that

2    the IEP that was drafted by the River School on

3    November 17, '04, is--has the same amount of

4    services in the general-ed setting, as does the IEP

5    that was drafted on September 12, '05?

6      A    Yes, it does.

7      Q    There's nothing different, isn't that

8    correct?

9      A    That's true, there's nothing different.

10      Q    Isn't it true that, at the conclusion of

11    the hearing, the last hearing that was held on Mia,

12    the Hearing Officer ordered for Mia to remain at

13    the River School?

14      A    He--

15          MS. CHAPMAN:    Objection--

16          THE WITNESS:    You mean the IEP that DCPS

17    drafted with the River School, which is the one

18    that--not the one that you did after we left?

19          BY MS. DALTON:

20      Q    That's not my question.    My question is,

21    isn't it true that the Hearing Officer's decision

22    placed Mia at the River School.

1            MS. CHAPMAN:  Objection, can she clarify,

2    I mean, placed, what, that's a--he didn't place her

3    there--

4            MS. DALTON:  For the remainder of the

5    school year.

6            MS. CHAPMAN:  Okay.

7            THE WITNESS:  Yes, he placed her there for

8    the remainder of the school year.

9            BY MS. DALTON:

10    Q    Isn't it true that she receives her

11    services at the River School in a general-ed

12    setting?

13    A    She shouldn't have, according to the IEP.

14    Q    I'm asking you, does she?

15    A    She did, but she shouldn't have.

16    Q    With regard to the FM system, isn't it

17    true that, when you initially wrote that the River

18    School doesn't have an FM system, you later

19    corrected yourself on the next page and indicated

20    they do have an FM system, that they have been

21    loaning Mia?

22            MS. CHAPMAN:  Objection, she's

wtk                                                                    57

1   already--that's been asked and answered, she

2   already testified as to what her understanding was

3   of the FM system and at no point did she indicate

4   anything else.

5          HEARING OFFICER DuBOW:  Well, two pages

6   are in direct conflict and if she can shed some

7   sort of clarification, I'll allow the question.

8          BY MS. DALTON:

9      Q    Ms. Owens, isn't it true that by the end of

10  the IEP meeting, you did realize that the River

11  School has been loaning Mia an FM system to use?

12     A    Dr. [unintell.] indicated that, possibly,

13  that there is an FM system at the River School that

14  they are letting her to use [unintell.] indicate.

15     Q    Isn't it true that there was discussion

16  about the fact that DCPS was to have provided an FM

17  system but had not?

18     A    We did talk about that.

19     Q    So, the answer is, yes?

20     A    Yes, we did talk about that.

21     Q    Has DCPS provided the FM system as of this

22  date?

wtk                                                                    58

1      A    For Mia?

2      Q    Yes.

3      A    You'd have to ask the person in charge of

4   that.  You should talk to John Schmitt.

5           MS. DALTON:  I have no further questions.

6           HEARING OFFICER DuBOW:  Thank you very

7   much.

8           MS. CHAPMAN:  No further questions.  Thank

9   you very much.

10          THE WITNESS:  Okay.

11          HEARING OFFICER DuBOW:  Good bye.  We'll

12  take a five-minute recess.

13          [Recess.]

14          HEARING OFFICER DuBOW:  Call your next

15  witness.

16          MS. CHAPMAN:  Actually DCPS is not going

17  to call any witnesses and we are going to stipulate

18  to placement at River for the '05/'06 school year.

19          HEARING OFFICER DuBOW:  Okay.

20          MS. DALTON:  The only, I guess, I mean, I

21  love the fact that you're proposing a settlement,

22  Ms. Chapman, but, I guess my client is extremely

wtk

1   concerned about this seems to be a continually

2   litigated case.

3           MS. CHAPMAN:  Mm-hmm.

4           MS. DALTON:  She doesn't want to go

5   through this every single year.

6           MS. CHAPMAN:  Well, the only issue on that

7   is that we do re-evaluate placement every year. I

8   mean, I'm certainly not going to say that--I

9   wouldn't say it beyond the '05/'06 school year,

10  because I don't know what will happen beyond the

11  '05/'06 school year.  I'm certainly not saying that

12  it will or it won't be re-evaluated, because I

13  know, not just in this case, but just placement, in

14  general, we re-evaluate that and issue Notices of

15  Placement for each school year.

16          MS. DALTON:  And I understand that.  It's

17  just--and I wouldn't even bring this up except for

18  the history of this case.  And I know you are not

19  familiar with it because it was Mr. Schreveman

20  [ph], who was the attorney before, but not only did

21  we have a prior hearing, but then they appealed the

22  case, so it's in the federal court right now, which

1   has cost my client money.

2           And on top of that, then they issued

3   another Notice of Placement, which cost her money

4   to have to come back to hearing again.  And they

5   keep proposing the same placement without anything

6   different changing in the meantime.

7           Part of my relief that I was going to ask

8   for--and I know it's a little unusual relief, but

9   was that the Hearing Officer, in addition to

10  placing Mia at the River School for the remainder

11  of this school year, also prohibit DCPS from

12  recommending the proposed--or the placement at Key

13  School without having some prior determination that

14  something has changed.  Because you keep proposing

15  the same school when a Hearing Officer has already

16  said, you haven't met your burden of proof and it

17  causes my client a lot of anguish and a lot of

18  unnecessary expense.

19          MS. CHAPMAN:  I can certainly understand

20  that, however, I'm not necessarily inclined to bind

21  my client to something that, by law, IDEA, we do

22  have to go back and revisit an issue, the Notices

1    of Placement.  So, I mean, I'm happy to--

2          MS. DALTON:  But, do you understand, my

3    client had to expend money.  She had to hire an

4    expert witness; she's had to reimburse witnesses

5    for their expert testimony.  And DCPS comes in and

6    settles it.

7          MS. CHAPMAN:  I do understand that.  I

8    most certainly understand that and even with that

9    understanding, I don't see how I could agree to

10   anything beyond the '05/'06 school year, just based

11   upon--because, then, I think I'd be prejudicing my

12   client in terms of the confines of IDEA 2004.  So,

13   I mean, that doesn't mean that I don't understand

14   and empathize with what you're presenting to me.

15   But I don't know how to get around that, without

16   hurting my client further.

17         I mean, I think that we are, for the

18   '05/'06 school year, and I don't--and I'm not even

19   making a representation that anything will change.

20   I mean, we could, nothing could change.

21         MS. DALTON:  Well, I guess, based on that,

22   I would make a motion along the lines of what my

wtk

1   relief was; that, based on the fact that DCPS has

2   come here without evidence to support their case,

3   and is now, on the first day of the hearing

4   proposing a settlement, and based on the history of

5   this case; that we've been to hearing before.

6   There was a Hearing Officer's determination that

7   indicated DCPS had not met its burden of proof

8   previously, and thereafter DCPS appealed that case,

9   which my client is now having to endure the cost of

10  that appeal, that the Hearing Officer consider

11  granting my motion that DCPS not be allowed to

12  propose the Key School in the future with regard to

13  Mia without some prior determination from a Hearing

14  Officer that it is an appropriate program.

15          MS. CHAPMAN:  And I'd just, also, like to

16  just say one thing.  In the last HOD that counsel

17  is referencing, which was issued in March of last

18  year, that even that was for--placement was for the

19  '04/'05 school year. and the Hearing Officer did

20  order DCPS to come back to the table and issue a

21  new Notice of Placement for the '05/'06 school

22  year.

1          MS. DALTON:  And may I, also, just say

2    that in that Hearing Officer's determination on

3    Page 13, it says, the Hearing Officer is concerned

4    that DCPS did not conduct its own evaluations of

5    the Student or present testimony that sufficiently

6    refuted the experts who had significant experience

7    with the Student.

8          The one expert DCPS presented had not

9    observed the Student; had only reviewed her

10   speech-and-language report.  And from the report

11   concluded the Student must be frustrated in the

12   current placement.

13         DCPS presented significant testimony on

14   its program, but far less on the Student.  He goes

15   on to say that there may be a point at which a

16   legitimate change in the special-education

17   methodology and placement is appropriate.  However,

18   such a change must be supported by stronger

19   evidence than was presented by DCPS in this case.

20         And, then, we're here again today and you

21   don't even have any evidence.

22         MS. CHAPMAN:  Well, I mean, my--my

1  statement still stands.  Like I said, I understand

2  what you're saying, but I hope that you understand,

3  also, my need and obligation to do in still

4  settling, but to, also, protect my client.  So, I

5  mean, I, like I said, we do stipulate to the

6  '05/'06 school year, and I don't see how I can go

7  beyond that and still represent the best interests

8  of my client, because I don't know what factors

9  will happen later on in the future.

10         And, again, like I said, I'm not making a

11  representation today that anything will change;

12  that the facts will change substantially that would

13  warrant a change in placement in future years.  I

14  can't make that representation.

15         MS. DALTON:  But my problem is that DCPS

16  didn't have to take this case this far, they could

17  have settled it a lot sooner than this, the day of

18  the trial, when my client has already had to expend

19  money for Dr. Morraire [ph] to come here and

20  testify.  I mean, you knew what your case was, you

21  knew what your witnesses were and to wait till the

22  day of the hearing, after your first witness

1  testifies and then settle the case, it smacks of

2  just not being very genuine on the part of DCPS--

3            MS. CHAPMAN:  Well--

4            MS. DALTON:  --and to keep dragging the

5  Parent down here.

6            MS. CHAPMAN:  --I mean, I certainly take

7  issue with the illusion that me settling at this

8  point is me not being genuine.  I mean, I

9  certainly--

10            HEARING OFFICER DuBOW:  All right, I've

11  heard enough.  All right DCPS has a settlement

12  offer on the table to fund and place the Student at

13  River School for '05/'06, does the Parent accept

14  that or not?

15            MS. DALTON:  I would--may I speak to my

16  client first--

17            HEARING OFFICER DuBOW:  Yes.

18            MS. DALTON:  --before I accept it?  Are

19  you--is the Hearing Officer at all inclined to

20  consider the Parent's motion?

21            HEARING OFFICER DuBOW:  What is the legal

22  basis for that motion?

1              MS. DALTON:  The basis would be--

2              HEARING OFFICER DuBOW:  Do you have any

3    legal authority to support me going beyond '05/'06?

4              MS. DALTON:  --I'm not asking--

5              HEARING OFFICER DuBOW:  Or what you're

6    asking is they cannot bring a suit--they cannot

7    change placement unless they have different or

8    newer evidence than as presented here, is that what

9    you're saying?

10             MS. DALTON:  Yes.

11             HEARING OFFICER DuBOW:  All right.

12             MS. CHAPMAN:  My response would be--

13             HEARING OFFICER DuBOW:  I've never had

14   that come before me.  So, the question is, do I

15   have any legal authority to do that?

16             MS. DALTON:  Well, I think that the

17   Hearing Officer can fashion, I mean, it's equitable

18   relief.  I think you have discretion.

19             HEARING OFFICER DuBOW:  Yes, I can fashion

20   equitable relief, but whether I can prevent

21   somebody from taking certain action on either side,

22   I don't know that I have that authority.  A lot of

1  times the Parent's attorneys would bring complaints

2  that maybe shouldn't be brought.  But my job is to

3  hear them.  I don't know that my job is to prevent

4  them.  So, if you have some authority, I'll hold

5  the Record open for three days, if you want to

6  present it to me, I'll consider it, but other than

7  that, I don't know that I have the authority to do

8  that.  Do you have any authority or know of any

9  authority?

10         MS. DALTON:  No, I don't, Mr. Hearing

11 Officer.

12         HEARING OFFICER DuBOW:  All right.  I

13 don't know of any authority.

14         MS. DALTON:  My I talk to my client about

15 the settlement offer?

16         HEARING OFFICER DuBOW:  Yes.

17         [Recess.]

18         HEARING OFFICER DuBOW:  We're on the

19 Record.  I understand an agreement has been reached

20 in this case.  What is that?  Whoever wants to say

21 it.

22         MS. CHAPMAN:  Okay, so, DCPS has agreed to

1  placement at the River School for the '05/'06

2  school year and despite the results, there is an

3  appeal filed on a prior Complaint for the '04/'05

4  school year.  And even if DCPS is the prevailing

5  party in that appeal, that will not affect the

6  placement for the '05/'06 school year.

7           MS. DALTON:  Say it one more time; despite

8  the--

9           MS. CHAPMAN:  Even if DCPS is the

10 prevailing party--

11          MS. DALTON:  On the appeal.

12          MS. CHAPMAN:  --on the appeal--

13          HEARING OFFICER DuBOW:  Well, how about if

14 I just say it will be unaffected by--

15          MS. DALTON:  By the result of the--

16          HEARING OFFICER DuBOW:  --by results of

17 pending federal litigation.

18          MS. CHAPMAN:  That's fine.

19          HEARING OFFICER DuBOW:  And, I would urge

20 you, because federal courts are overloaded as it is

21 that action be taken to remove this case from the

22 docket of the federal court.  I know you don't have

wtk                                                                        69

1    the power to do that.  I don't have the power to do

2    that.  But, in light of this agreement, DCPS would

3    be ill-advised to get the wrath of Judge

4    [unintell.].  Okay, thank you very much.

5              MS. CHAPMAN:  Thank you.

6              [Whereupon, the hearing was concluded.]

7                             -  -  -